Thomas W. **FULKERSON,**
et al., Plaintiffs,

v.

**CITY OF LANCASTER, Manor
Township, Ross A. Deck,
and Randy Herman.**

Civ. A. No. 91–2058.

United States District Court,
E.D. Pennsylvania.

Aug. 24, 1992.

VAN ANTWERPEN, District Judge.

This is a civil rights action arising out of a collision between a police car operated by Sergeant Ross A. Deck of the City of Lancaster Police Department and plaintiffs' car. Sergeant Deck and several other police officers, including defendant Randy Herman, were pursuing a fleeing motorcyclist when Deck's vehicle collided with the car in which the plaintiffs were traveling in the opposite direction. Plaintiffs suffered severe injuries in the accident, and subsequently filed this action under 42 U.S.C. §§ 1983 and 1988.[1]

Plaintiffs allege that the conduct of the individual officers was so reckless that it amounted to a deprivation of the plaintiffs' constitutional right to life, liberty and property without due process of law. Plaintiffs also claim that the City of Lancaster and Manor Township, both Pennsylvania municipalities, violated the plaintiffs' constitutional rights by causing plaintiffs' injuries through the policies or customs of failing to train their officers properly and permitting high speed chases without adequate provocation. Complaint ¶ 24.

Defendants have moved for summary judgment under Fed.R.Civ.P. 56.

## I. SUMMARY JUDGMENT STANDARD

The Court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying for the court those portions of the record which it believes demonstrate the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

Richard C. Low, Lancaster, Pa., for plaintiffs.

George C. Werner, Lancaster, Pa., Robert G. Hanna, Jr., Daniel P. Carter, Philadelphia, Pa., for defendants.

1. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343.

242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (hereinafter *"Liberty Lobby"*). "[A] non-moving party must adduce more than a mere scintilla of evidence in its favor, ... and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir. 1989) (citing *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, and *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2553.)

A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985) *cert. denied* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

## II. STATEMENT OF FACTS

### A. The Pursuit and Collision

The following facts are essentially undisputed. Where there is some question as to the existence of a fact, we resolve the doubt in favor of plaintiffs, the non-moving party.[2] On April 27, 1990, in the evening, City of Lancaster Police Officer Sonia Hurdle observed a man on a motorcycle (later determined to be Wayne Richard Edwards) commit several traffic violations, including driving through a red stop light, failing to lower the visor on his helmet, and driving between lanes of traffic. Hurdle Dep. at 16–18. After Edwards nearly forced an automobile off the road, Officer Hurdle activated the emergency lights on her marked police car and began to pursue Edwards. The motorcyclist fled, driving in excess of the speed limit, weaving in and out of traffic, and driving through all red stop lights in his path. Officer Hurdle transmitted a description of the motorcyclist over the radio to her superior, Sergeant Ross Deck. She also informed Sergeant Deck that the motorcyclist had

turned off his lights to avoid being seen. Deck Dep. at 62. She then lost contact with the motorcycle.

Having monitored Officer Hurdle's radio transmissions, Sergeant Deck and Officer Peter Zipp, of the Lancaster Police Department, observed a motorcycle matching Hurdle's description traveling at a high rate of speed and they each pursued the motorcycle with their emergency lights activated. The motorcyclist continued to drive erratically, and at one point sped through a gas station, causing pedestrians to jump out of the way to avoid being run down. Deck Dep. at 83.

Shortly after the motorcyclist sped through the gas station, Officer Randy Herman of the Manor Township Police Department joined in the pursuit, directly behind the motorcycle and in front of Sergeant Deck, with about a tenth of a mile separating Officer Herman's car from the motorcycle and Sergeant Deck's car. Deck Dep. at 84–85. Officer Herman was in a marked police car with emergency lights and sirens activated. Herman Dep. at 28. The order of travel was Edwards on the motorcycle, Officer Herman in his police cruiser, followed by Sergeant Deck, who was in turn followed by Officer Zipp.

The pursuit proceeded through Manor Township, over mostly two-lane roads with moderate traffic. For the most part, the police officers maintained visual contact with the motorcycle, and occasionally they pulled to within two hundred feet of it, at busy intersections. Deck Dep. at 76–77, 93–95, 97. Sergeant Deck estimates that speeds in the chase varied from as slow as thirty-five to forty miles per hour to as fast as seventy to eighty miles per hour. Deck Dep. at 74–75, 99.

Based on his experience with the type of motorcycle the fleeing suspect was riding, and knowing the acceleration and cornering capabilities of that type of motorcycle, Sergeant Deck concluded from the way that the fleeing suspect was driving that he was

---

**2.** We state these facts in the context of a summary judgment motion, and we do not intend to make binding findings of fact which will have any res judicata effect in any future state court negligence action.

either inexperienced or intoxicated, and that the motorcycle might have been stolen. He based that conclusion on the suspect's failure to take advantage of the motorcycle's capacity for rapid acceleration to outrun the pursuing officers. Instead of speeding around the automobiles which he overtook, the suspect repeatedly slowed down behind the automobiles, using erratic braking patterns, until the police cars closed the distance, and then the suspect would pass the car blocking its escape path. Deck Dep. at 78–82.

Given the erratic driving of the fleeing suspect, Sergeant Deck concluded that the officers were likely to apprehend him. Deck Dep. at 82. The likelihood of apprehension, coupled with the danger to the public of allowing the suspect to continue his reckless driving, prompted Sergeant Deck to continue the pursuit outside of his primary jurisdiction. The last thing Deck remembers about the pursuit that day is following the motorcycle down the New Danville Pike toward the intersection with Long Lane, travelling at about sixty miles per hour in a 35–40 mile per hour zone.

While Sergeant Deck does not recall the events immediately before and during the collision, other evidence indicates that his vehicle crossed the center line of the road a short distance beyond Long Lane, while negotiating an unmarked curve, and struck the plaintiffs' car in the opposing lane of traffic. Mowday Dep. at 60 and attached Police Accident Report. The accident took place in Pequea Township.

Officer Herman first learned of the accident through a radio transmission from another police officer. Herman Dep. at 23. He did not see the accident take place, and does not know how far ahead of Deck's vehicle he was at the time. *Id.* at 37.

The fleeing suspect, Wayne Edwards, was apprehended after the collision, and was charged with recklessly endangering another person, a second degree misdemeanor; reckless driving; fleeing a police officer; and several traffic offenses. *See* Hurdle Dep., Exhibit 1.

## B. Municipal Pursuit Policies

The City of Lancaster had a written pursuit policy, promulgated by its chief of police, in effect at the time of the collision. The policy gave the individual officers of the department the discretion to commence or terminate a pursuit after weighing certain factors. *See* Lefever Dep., Exhibit 1. The street supervisor or officer in charge at the time also had the authority under the written policy to terminate a pursuit. The policy required officers to consider the following factors:

1. The type of violation committed;
2. Weather and road conditions;
3. Visibility;
4. Traffic conditions (time of day, location);
5. Dangers to motorists and pedestrians if the vehicle is not pursued;
6. Availability of assistance;
7. The probability of apprehension in light of these risk factors.

In addition, the policy specified certain procedures to be followed in all pursuits, such as use of emergency lights and siren, maintaining control of one's vehicle and adjusting to traffic and road conditions, and not ramming or bumping the fleeing vehicle except in the most extreme cases. Officers in the department were required to familiarize themselves with this policy, and received roll call training in carrying it out. Goeke Dep. at 52; Hurdle Dep. at 7–9; Deck Dep. at 15–21; Barley Dep. at 7; Lefever Dep. at 7–8.

Manor Township had a written pursuit policy, promulgated by its chief of police, which set out the requirements of Section 3105 of the Pennsylvania Vehicle Code for drivers of emergency vehicles, and also specified procedures to be followed in pursuits. *See* Herman Dep. Exhibit 3; Sheeler Dep. at 19. Officers involved in pursuits are required under the policy to keep in contact with the county radio dispatcher, broadcasting the officer's location, reason for pursuit, and a description of the pursued vehicle. Officers must take "all precautions ... to protect all lives and property during any pursuit, even to the point of

withdrawal." Officers may not block a roadway or ram or shoot at the suspect's car unless necessary to apprehend a suspected felon who posed a substantial risk of causing death or serious bodily injury if not apprehended without delay. The policy also required officers to consider certain factors in deciding whether to initiate, continue or terminate a pursuit, such as the safety of the public and the pursuing officer; the time of day; traffic, weather and road conditions; the officer's familiarity with the area of the pursuit; the speed involved; the quality of radio communications with the dispatcher and supervisor; and the capability of the police vehicles involved. Officers must use emergency lights and sirens.

The policy instructs officers to use extreme caution in deciding to pursue at high speeds, and warns that infractions of the policy can result in reprimands, suspension or dismissal.

### C. Training of Sergeant Deck and Officer Herman

Ross Deck became a police officer in 1976. He attended the Pennsylvania State Police Academy. Deck Dep. at 6, 47. Prior to joining the department, he attended courses in emergency driving and driving techniques beginning in 1973, with a local fire department. In 1977 he attended a driving course sponsored by the Lancaster Police Department. *Id.* at 14. He attended another driving course in 1984. In addition, Deck completed yearly mandatory in-service training, and attended "roll call training" in the City's pursuit policy. In 1988, he attended a three day training program called "Street Survival." *Id.* at 23. That program dealt with pursuit tactics, and included films of actual pursuits from around the country.

Officer Herman became a police officer in 1975, when he joined the Columbia Borough Police Department. At that time, he attended the municipal police officers' training program in Hershey, Pa. He joined the Manor Township Police Department in 1978. The only training he ever had in pursuits, *per se*, was when his Man-

or Township supervisor went over the department's written policy with him. Herman Dep. at 8–9.

### D. History of High Speed Pursuit Collisions

Lancaster Chief of Police Walter T. Goeke identified one prior incident within his department of a collision resulting from a high speed pursuit. Goeke Dep. at 106. That incident occurred more than five years before the Deck/Fulkerson collision, and the officer involved was disciplined. In the five years before the Fulkerson accident, there were no other incidents, and Chief Goeke did not believe that there was a problem in the department with pursuits. *Id.*

Ross Deck was not involved in any vehicular accidents in the five years preceding the Fulkerson accident. Deck Dep. at 32. He was involved in approximately six pursuits, and supervised another five or six pursuits, in the five years preceding the accident. He called off several of those pursuits. *Id.* at 38–42. In one pursuit, a suspect's vehicle collided with a bystander's vehicle. *Id.* at 44.

Plaintiffs have not presented any evidence of any pursuit-related collisions in Manor Township.

## III. DISCUSSION

### A. Liability of Ross Deck

The Fourteenth Amendment Due Process Clause is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986), quoting *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). "[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Id.* at 328, 106 S.Ct. at 663. While the Supreme Court makes it clear that in order to hold Sergeant Deck liable for their injuries under § 1983, plaintiffs must show more than mere negligence, the Court has not yet stated wheth-

er something less than intentional conduct suffices. The Third Circuit Court of Appeals has stated that plaintiffs may recover under § 1983 for injuries to persons in state (or municipal) custody upon a showing of gross negligence, reckless disregard, deliberate indifference or reckless indifference. *Williams v. Borough of West Chester*, 891 F.2d 458, 464, n. 10 (3d Cir.1989).

"Negligence does not become gross just by saying so.... The facts alleged in support of the legal conclusion of gross negligence must be sufficient to charge the government officials with outrageous conduct or arbitrary use of government power." *Jones v. Sherrill*, 827 F.2d 1102, 1106 (6th Cir.1987). In *Jones,* the plaintiffs alleged that the defendants, a county sheriff and other officials, furloughed a prisoner with known propensities for driving while intoxicated. The furloughed prisoner proceeded to get drunk, obtain a car, and provoke a high speed pursuit by two police officers. The pursuit reached speeds of 135 miles per hour before the furloughed prisoner collided with plaintiffs' decedents' automobile. The Sixth Circuit Court of Appeals held that the complaint did not state a claim for gross negligence on the part of either the sheriff who furloughed the prisoner, or the officers who pursued the prisoner.

The Court of Appeals for the Eighth Circuit has also refused to impose § 1983 liability on a police officer for injuries to innocent bystanders arising out of a collision with the officer's automobile and the automobile the officer was pursuing at high speeds. *See Roach v. City of Fredericktown*, 882 F.2d 294, 297 (8th Cir.1989). The police officer in *Roach* pursued a car outside of his own jurisdiction because the car's license plate was registered to a car with a different description. The plaintiffs claimed that the officer's conduct was reckless or grossly negligent, and that the city which employed the officer was liable because it failed to give the officer adequate training in how or when to conduct high speed pursuits. The district court dismissed the plaintiffs' complaint for failure to state a claim. The appellate court upheld the dismissal, holding that the facts alleged did not rise to the level of gross negligence. *Id.*

■ The claims of the plaintiffs in this case are not substantially different from those in *Jones* or *Roach.* In each case, the police officer pursued a traffic offender at high speeds, and a collision with an innocent bystander resulted. As in *Jones* and *Roach,* plaintiffs have shown, at most, evidence that the pursuing officer may have acted imprudently in continuing his pursuit over roads with which he was not very familiar or in driving at too high a speed. Prudence and imprudence are the subject of negligence law, not due process, and this claim cannot succeed under § 1983.

B.   Predicates to a Municipality's § 1983 Liability

■ Local governments may not by held liable under § 1983 for the actions of their employees on a theory of *respondeat superior,* but they may be held to answer for constitutional violations caused by an official policy or custom of the municipality. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). The Supreme Court defined such a municipal policy as a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." *Id.* at 690, 98 S.Ct. at 2036. A municipal custom for § 1983 purposes is "such practices of state officials ... [as are] so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970). "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (opinion of Brennan, J.) (1986). *See also City of Canton v. Harris,* 489 U.S. 378, 389–90, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427,

2436, 85 L.Ed.2d 791 (opinion of Rehnquist, J.) (1985).

█ The officials who can bind the municipality thus are those "whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38. Which official or officials has final policymaking authority for a municipality on a particular issue is a question of state law, to be decided by the judge by referring to state and local law, as well as custom or usage having the force of law: *Jett v. Dallas Independent School District*, 491 U.S. 701, 736–38, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989).

The Supreme Court has held that a municipality may incur liability for constitutional injuries caused by its failure to train its police officers only where that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204. Only when the failure to train is coupled with such deliberate indifference—"a deliberate or conscious choice"—does it rise to the level of a municipal policy or custom. *Id.* 489 U.S. at 389, 109 S.Ct. at 1205, *quoted in Simmons v. City of Philadelphia*, 947 F.2d 1042, 1060 (3d Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992). "[T]he need for more or different training [must have been] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city [could] reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390, 109 S.Ct. at 1205.

Justice White's example of deliberate indifference to an obvious need for training is a police department sending its armed officers out to arrest fleeing felons without instructing them in the constitutional limitations of the use of deadly force by police officers ·outlined in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Even if there had been no prior *Garner* violations by the city's officers, the city would be culpable if an officer violated a person's Fourth Amendment rights out of ignorance of those rights, because the potential for violations of fleeing suspects' rights is so obvious, without training. *City of Canton*, 489 S.Ct. at 390, n. 10, 109 S.Ct. at 1205, n. 10.

Deliberate indifference is a difficult concept to apply to concrete facts. The Supreme Court, in *City of Oklahoma City*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436 (opinion of Rehnquist, J.), stated that

> [P]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. . . . But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.

The concurring justices in *City of Oklahoma City* agreed with then-Justice Rehnquist that "the scope of § 1983 liability does not permit such liability to be imposed merely on evidence of the wrongful actions of a single city employee not authorized to make city policy." *Id.* at 833, 105 S.Ct. at 2441 (opinion of Brennan, J., joined by Marshall and Blackmun, JJ.).

The Third Circuit Court of Appeals interprets these Supreme Court cases to require that the plaintiffs adduce "scienter-type evidence" with respect to a high level official who has final policy-making authority under local law in the areas in question. *Simmons*, 947 F.2d at 1062–63. In *Simmons*, it was undisputed that there had been a remarkable number of suicides in city jails similar to the suicide of the plaintiff's deceased son. The issue on appeal was what evidence, beyond the data on prior suicides, the plaintiff should have been required to present in order to show the requisite deliberate indifference to her son's constitutional rights. The *Simmons* court stated, in dicta, that the plaintiff must have shown that city policymakers,

*"knowing* of the number of suicides in City lockups, either deliberately chose not to provide officers with training in suicide prevention or acquiesced in a longstanding practice or custom of providing no training in this area." *Id.* at 1064 (emphasis added).

Chief Judge Sloviter filed a concurring opinion in *Simmons* in which she rejected the use of the word "scienter" in the opinion of the Court, written by Judge Becker. Chief Judge Sloviter would find § 1983 liability for failure to train where municipal policymakers recklessly refused to take account of facts or circumstances which responsible officials should have known, as well as in cases where the policymakers had actual knowledge of the relevant facts or circumstances. 947 F.2d at 1090. Chief Judge Sloviter's concern was that municipalities might escape liability through wilful blindness, where the Supreme Court's decision in *City of Canton* intended to hold cities liable where "the need for more or different training [must have been] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city [could] reasonably be said to have been deliberately indifferent to the need." *Id.* at 1091 (citing 489 U.S. at 390, 109 S.Ct. at 1205).

■ Under either Judge Becker's or Chief Judge Sloviter's analysis of deliberate indifference, the requirement of a pattern of constitutional violations, or an extremely obvious need for training, remains. The municipality's policymakers must be put on notice, whether actually or constructively, of the need for more training, or the need for a different policy, before they can be found deliberately indifferent to that need. We must be cautious about finding that a need is "obvious" absent a history of violations, lest the federal courts become engaged in "an endless exercise of second-guessing municipal employee-training programs." *City of Canton,* 489 U.S. at 391, 109 S.Ct. at 1206.

With these principles in mind, we now turn to Plaintiffs' claims against the City of Lancaster and Manor Township.

## C. Liability of City of Lancaster

■ Plaintiffs in this case allege that the municipal policies of the City of Lancaster which caused their injuries were twofold. First, it is alleged that the City of Lancaster failed to give their officers "specialized training ... on the subject of high speed chases and their constitutions, statutory and departmental limits of their authority." Second, the municipal defendants are charged with having a "custom and practice of encouraging such chases for the sake of apprehending suspects, however minor the violation, at the expense of the safety and well-being of the innocent public...." It is the plaintiffs' position that their injuries could have been avoided if Sergeant Deck had been trained beyond the normal police academy driving training, in special techniques of chasing suspects at high speeds. Alternatively, the injuries could have been avoided if Lancaster had established a policy of not pursuing suspects who committed minor infractions. Defendants contend that a single incident of what was, at most, negligent driving, cannot support a finding of deliberate indifference to plaintiffs' constitutional rights by the defendants.

The defendants do not dispute that the chief of police of the City of Lancaster is an official "whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38. Plaintiffs direct our attention to the written policy regarding pursuits promulgated by the chief of police. They contend that this policy, together with the undisputed evidence that Lancaster police officers have pursued minor offenders at high speeds in the past, shows that Lancaster has "a custom and practice of encouraging such chases ... at the expense of the safety and well-being of the innocent public." Complaint, ¶ 23. It is not disputed that Lancaster did permit its officers to pursue persons suspected of minor traffic offenses. However, even accepting plaintiffs' evidence of prior high speed pursuits, we must still require evidence of some prior collisions or injuries in the course of those pursuits in order to find that the custom was at the expense of the public's

safety—that is, that the custom or policy was a product of deliberate or reckless indifference to constitutional violations. Otherwise, all that plaintiffs will have shown is a perfectly reasonable policy which had created no problems for the department in the past.

The written pursuit policy in effect in Lancaster at the time of the accident is not unconstitutional on its face. Municipalities are permitted by the Constitution to use high-speed pursuit as a method of apprehending traffic offenders. *Jones v. Sherrill,* 827 F.2d 1102, 1106 (6th Cir.1987); *Galas v. McKee,* 801 F.2d 200 (6th Cir. 1986). Vehicle operators who are not pursued and stopped by the police can also present a danger to the public. Pennsylvania law permits police officers to exceed the posted speed limit, drive through red stop lights, and otherwise disregard the traffic laws while pursuing suspects, as long as their emergency lights and sirens are engaged. 75 Pa.Cons.Stat.Ann. § 3105. Section 3105 does not relieve pursuing officers of their duty to drive with due regard for the public's safety. § 3105(e). In the face of an otherwise constitutional policy, our analysis must focus on whether the policy was enacted with deliberate indifference to the constitutional rights of the persons whom the officers of the Lancaster police department might encounter. *See City of Oklahoma City,* 471 U.S. at 823–24, 105 S.Ct. at 2436.

Plaintiffs offer no evidence of any previous injuries or collisions which occurred during a high speed chase in which either municipality's police department participated, beyond a single incident more than five years before the accident at issue here. No details about that single incident were provided. The sole source of information about it is Chief Goeke's vague recollection, during his deposition, that there was an accident over five years ago. Likewise there is no evidence that the policymakers of the City of Lancaster were otherwise aware that the policy of giving their officers the discretion to pursue traffic offenders might endanger the constitutional rights of innocent bystanders.

Nor do we find any basis in fact for a deliberately indifferent failure to train. Given the extent of the standard training in driving techniques which Lancaster's officers receive, and the almost complete lack of any prior complaints or injuries relating to high speed pursuits at the time of plaintiffs' accident, there was no "obvious need" for specialized training in pursuits, beyond what was given. There simply was no sign of any problem or deficiency in the departments' policies. This is not a case analogous to the Justice White's example, in *City of Canton,* of the police officers not instructed that they could not constitutionally shoot down a fleeing suspect who did not pose a risk to the community. To the contrary, the officers of the City of Lancaster *were* instructed in the legal limitations of the intentional use of such deadly force as ramming, blockading or shooting at a pursued vehicle.

Absent such "scienter-type" evidence, no reasonable jury could find that the municipality acted with deliberate indifference to plaintiffs' rights. To hold otherwise would subject municipalities to § 1983 liability every time a municipal employee caused any injury, because the injury could always be traced back to some "municipal policy" which, if changed, could have prevented the injury. To use Chief Justice Rehnquist's example, the plaintiffs would never have been injured if the City of Lancaster and Manor Township did not have a "policy" of establishing a police force. *City of Oklahoma City v. Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436 (opinion of Rehnquist, J.).

Defendants urge us to base our decision on the additional ground that the City of Lancaster cannot be held liable under *Monell* unless Sergeant Deck is also found to have committed a constitutional violation. They base this contention on the Supreme Court's decisions in *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), and the court of appeals' decision in *Williams v. Borough of West Chester,* 892 F.2d 453.

This argument is at odds with the Third Circuit's analysis of the nature of a failure to train claim. When a plaintiff bases a

§ 1983 claim on a municipality's failure to properly train its officers, liability is based on a constitutional violation committed by the policymaking official who acted with deliberate indifference to the plaintiff's constitutional rights, thereby causing the injury in question. *See Simmons,* 947 F.2d at 1063. In this case, as in *Simmons,* the individual police officer named as a defendant could be a causal conduit for the constitutional violation, without committing such a violation himself.

In *City of Los Angeles v. Heller,* a case alleging excessive force in arrest, a jury had concluded as a matter of fact that there had been no constitutional violation because the arresting officer had acted with reasonable cause, and had not used more force than was necessary under the circumstances. The Supreme Court concluded that since no constitutional harm had been inflicted, on those facts, the municipality could not be liable for causing any constitutional violation. In *Simmons,* and in the case at bar, the individual officer is found not liable based on a lack of the requisite mental state—gross negligence or recklessness—rather than based on a lack of any constitutional injury. Therefore, we cannot absolve the City of Lancaster based solely on our decision that Sergeant Deck was not liable.

In sum, we hold that no reasonable jury could find that the City of Lancaster, through any of its officials, acted with deliberate indifference to the plaintiffs' constitutional rights. Thus, the City cannot be held liable under § 1983.

### D. Liability of Manor Township and Officer Randy Herman

As noted above, a municipality is not liable for injuries unless its customs, policies, or failure to train are the cause of plaintiffs' injuries. We need not discuss at length the policies of Manor Township, or its training programs or lack thereof, because we can find no basis in the record before us to believe that any rational jury could find that either Manor Township or Officer Herman were the proximate cause of plaintiffs' injuries. Absent that causal connection, there can be no § 1983 liability. *See Jones v. Sherrill,* 827 F.2d at 1107.

The court in *Jones* held that the police officers who pursued a fleeing intoxicated, reckless driver were not the proximate cause, in the constitutional sense, of the suspect's collision with an innocent bystander. *Id.* at 1103, 1107. The case at bar presents an even more remote connection between the defendant's conduct and the plaintiffs' injuries. Officer Herman did not chase Sergeant Deck into the path of plaintiffs' automobile. Instead, he was ahead of Deck, and well beyond the scene when the collision occurred.

Officer Herman participated in the pursuit of Wayne Richard Evans, but he was not involved in the collision between the plaintiffs' vehicle and Sergeant Deck's vehicle. His police cruiser was at least a quarter of a mile ahead of Deck's when the accident occurred, and was not even within visual range. There is no evidence that Herman led Deck into the collision, as plaintiffs claim, or that his presence somehow made the pursuit more dangerous or the collision more likely. In fact, the logical conclusion which the jury would be forced to reach is that the presence of Herman's flashing lights and siren made the pursuit safer, by alerting motorists to the presence of other pursuers behind him, including Sergeant Deck.

Officer Herman's remoteness from the scene of the accident, and the fact that he had no role in initiating the pursuit in question or in Sergeant Deck's decision to continue to participate in the pursuit, precludes a finding that either Herman or Manor Township were the "moving force" behind any violations of plaintiffs' constitutional rights. Not only have plaintiffs failed to show any causation here, but they have also failed to adduce any evidence indicating deliberate indifference of any policymaker of Manor Township to the constitutional rights of travelers such as plaintiffs. Just as with the City of Lancaster, there is no evidence in the record of any pattern of constitutional violations by Officer Herman, or any other employee of Manor Township. Nor is there any other evi-

dence showing that Manor Township's officials ignored an obvious need for training or for rethinking the police department's pursuit policy.

For the foregoing reasons, plaintiffs cannot recover under 1983 from either Manor Township or Randy Herman.

E.  State Law Claims

■ This action is essentially a tort case between citizens of the same state, and as such it belongs in the state court system. We decline to exercise our supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. 1367; and dismiss those claims without prejudice to plaintiffs' right to reassert them in a state court proceeding.[3]

ORDER

AND NOW, this 24th day of August, 1992, upon consideration of defendants' motions for summary judgment, and plaintiffs' response thereto, it is hereby ORDERED that summary judgment is granted on Counts I and II, and JUDGMENT IS ENTERED in favor of all defendants and against all plaintiffs on Counts I and II. Counts III through XI are hereby DISMISSED without prejudice to plaintiffs' right to reassert them in state court. This case is CLOSED.

---

**3.** Section 1367(d) provides that the period of limitations for claims such as plaintiffs' which are dismissed by the district court under that statute shall be tolled while the claim is pending in the district court, and for thirty days after dismissal, unless state law provides for a longer tolling period. In addition, Pennsylvania law provides that matters dismissed by a federal court for lack of jurisdiction may be refiled in the state courts without regard to the limitations period. *See* 42 Pa.Cons.Stat.Ann. § 5103.