Gregory TAYLOR, Individually, as Conservator of the Estate of Karen Taylor, and as Next Friend of Jennifer Lynn Taylor, a Minor, Plaintiffs,

v.

David WATTERS, Sergeant Joseph Swiercz, Captain S.J. Sullivan, and the City of Ferndale, a municipal corporation, and the Estate of Alvin Freeman, Deceased, Defendants.

Civ. A. No. 85–0605.

United States District Court,
E.D. Michigan, S.D.

Feb. 23, 1987.

See also, 636 F.Supp. 181.

Steven C. Berry, Troy, Mich., for plaintiffs.

John Hayes, John Dise, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

SUHRHEINRICH, District Judge.

Plaintiffs brought this action under 42 U.S.C. § 1983 to recover damages against several Ferndale police officers and the City of Ferndale for the shooting of Karen Taylor at the Rialto Restaurant on July 3, 1984. This matter is currently before the Court upon defendants' Motion to Dismiss or for Summary Judgment, part of which was decided per the Court's Memorandum Opinion of May 2, 1986 and part of which was reserved for judgment.

### I.

The Court has pieced together the following summation from the three depositions attached to defendants' motion.

At approximately 5:00 p.m. on July 3, 1984, Alvin Freeman walked into the Rialto Restaurant on Woodward Avenue in Ferndale, Michigan and sat at a table. After placing his order, Freeman walked over to Detective Dan Bolen of the Ferndale Police Department and shouted at him. Freeman drew his gun and fired at least two shots

which wounded Bolen and another patron, John Bylski. Freeman then grabbed the waitress, Karen Taylor, and ordered everyone to go out of the restaurant. Bolen was helped to the building next door. Bylski, however, collapsed on the sidewalk south of the restaurant. In addition to his own gun, Freeman had taken Bolen's service revolver.

Officers David Watters and Tom Cupples were the first officers to arrive at the Rialto. They immediately rendered aid to Bylski. Bystanders informed the officers that there was a man inside the Rialto with a gun and he had taken two female hostages. It is unclear from the testimony when the police realized that Freeman only had one hostage. Watters then proceeded to the rear of the restaurant.

Captain Stanley Sullivan and Sergeant Joseph Swiercz arrived at approximately 5:06. Within minutes, they established perimeters around the Rialto to keep pedestrians and motor vehicles out of the line of fire, positioned officers directly outside the restaurant and atop nearby buildings to control Freeman's movements, and began gathering information from the patrons and employees. This included having one of the employees provide a diagram of the inside of the restaurant. The employee indicated that there was a back passageway from the kitchen to the men's restroom which could not be seen from the dining area. Sullivan also talked to Bolen who identified Freeman as the gunman. Freeman was well known to the Ferndale Police Department, in part, because he owned a nearby party store. Freeman would regularly call the police to come over to the store and stand guard while he locked up at night. It also appears that Freeman had a violent relationship with his wife which required the police to frequently intervene in their disputes. In fact, Freeman was convicted the day before this incident of an assault charge involving his wife. The officers testified, however, that Freeman never demonstrated any animosity toward them and was even cordial to them when he was arrested on the assault complaint.

Sullivan, Swiercz and Lieutenant Marshall tried to negotiate with Freeman over the phone and the bull-horn during the entire siege. All three had some training and experience as negotiators. Freeman called the police station at approximately 5:18 and 5:23 and demanded that his wife be brought to the scene. He refused, however, to stay on the line. Sullivan then ordered the desk sergeant to continually call the restaurant. Sullivan also stationed an officer at the phone in a nearby store to call on a second line in an effort to force Freeman to negotiate. Freeman refused to answer the phones and ignored the officers' attempts to establish a dialog. He refused to articulate his demands and merely shouted for the officers to come in and get him.

At approximately 5:45 and 5:49, Freeman fired several shots at the officers. The first set of shots knocked out the front glass windows. Freeman again called the station and demanded to talk to the Chief. He again refused to stay on the phone.

In the meantime, Sullivan had directed Swiercz to enter the restaurant through the back door and pinpoint the locations of Freeman and the hostage. Swiercz entered the building at approximately 6:00. He was able to position himself near the swinging doors that separate the kitchen and dining areas. Officers Watters and Cupples also positioned themselves in the kitchen. After Swiercz was able to determine the approximate location of Freeman and the hostage, he left the building. Officers Watters and Cupples remained in the kitchen and were joined by Officer Raymond. Officers Page and Denmark were able to position themselves in the men's bathroom. At 6:29, Officer Denmark reported that a shot had been fired near the bathroom and he heard the hostage scream that she had been shot in the leg. The officers testified that Freeman and the hostage were yelling and screaming a great deal.

At this point, Sullivan called a conference with Swiercz and Marshall to develop a plan to make entry into the restaurant to secure the release of the hostage. Capt.

803

Sullivan testified that he decided to enter the building because 1) Freeman refused to negotiate 2) they couldn't make visual contact with Freeman through the long-range sniper weapons, 3) Freeman indicated by shooting the hostage that he had no intention of using her in his escape or negotiations, and 4) the need to provide the hostage with medical care.

Swiercz and Marshall led two teams into the restaurant at approximately 6:45. Officers Watters and Cupples joined Swiercz and positioned themselves in the men's bathroom at the southeast-east corner of the restaurant. Marshall and his group were stationed in the kitchen by the swinging doors near the north end of the building. The officers all testified that shortly before 7:00 they heard another shot and didn't hear anything from the hostage thereafter. According to the deposition testimony, Sullivan gave the order to fire shots above the doorway to create a diversion at 7:03:36. Within the next few seconds, Marshall threw a pot out of the kitchen to draw Freeman away from the south end of the restaurant. Freeman turned and fired at the officers who were coming out of the kitchen. Simultaneously, Swiercz and Watters came through the hallway near the bathroom and fired at Freeman who was standing over the hostage. The order to cease fire was given at 7:03:47. Freeman was hit in the head and arm and pronounced dead at the scene. The hostage was found sitting on the floor in front of the booth facing north with bullet wounds to the head and leg.

## II.

Plaintiffs allege in their complaint that the Ferndale police officers and their superiors forced "an unnecessary and avoidable confrontation" by failing to negotiate with Freeman or summon expert assistance from a trained hostage negotiator and intentionally discharged their weapons without verifying the position of Taylor. These actions were committed with "gross and culpable recklessness and in shocking and unjustified disregard for [Taylor's] safety and constitutional rights". Plaintiffs contend that Taylor was deprived of her liberty without due process of law in violation of the Fourteenth Amendment. The City of Ferndale also deprived Taylor of her constitutional right by not providing its officers with adequate training and supervision in hostage situations.

Section 1983 of the Civil Rights Act provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory". 42 U.S.C. § 1983. The statute's primary purpose is the "preservation of human liberty and human rights...." *Owen v. City of Independence*, 445 U.S. 622, 636, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980).

In order to recover under section 1983, plaintiffs must demonstrate that 1) some person or persons deprived Taylor of a federal right, and 2) the person or persons who deprived her of that right was acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Dunn v. State of Tennessee*, 697 F.2d 121, 125 (6th Cir.1982). There is no dispute here that the officers involved acted under color of state law. Therefore, the sole question before the court is whether Taylor was deprived of a federal right. Plaintiffs allege that Taylor was deprived of a liberty interest without due process of law when defendants entered the Rialto with the desire to execute Freeman at the expense of Taylor's life and safety. Plaintiffs advance a substantive due process claim.

In this case, plaintiffs allege that defendants acted unreasonably in violation of the United States Constitution. It does not appear, however, that plaintiffs' claim falls within the ambit of a specific constitutional guarantee other than the Fourteenth Amendment. As such, the Court must determine whether the defendants' actions "shock the conscience". *Wilson v. Beebe*, 770 F.2d 578, 584 (6th Cir.1985) (citing *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3208 n. 4, 82 L.Ed.2d 393). The Sixth Circuit has described this as a "substantive

due process right akin to the 'fundamental fairness' concept of procedural due process". *Beebe,* 770 F.2d at 584.

The "shocks the conscience" standard has its genesis in the *Rochin* case [*Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183]. There, a suspect placed some capsules containing narcotics in his mouth as he was being arrested. Police took him to the hospital where his stomach was pumped to recover the capsules as evidence. The Court found that such police conduct offended the "canons of decency and fairness which express ... notions of justice...." 342 U.S. at 169. *See also Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (intentional assault upon prisoner with death threat).

### III.

#### A.

■ In the instant case, plaintiffs rely heavily on the testimony of Ken Katsaris, a consultant in criminal justice, to establish that defendants' use of force was so excessive and the motivations of the officers involved so improper as to shock the conscience of the Court. For this reason, the Court has inquired further into whether Katsaris' testimony would be admissible. Because of the pivotal nature of this testimony the Court requested, in a hearing held April 24, 1986, that the parties provide further details on the qualifications of Katsaris to be an expert witness.

The Court has reviewed the credentials of plaintiffs' proffered expert Katsaris. Despite the Court's request to the plaintiffs for the details of plaintiffs' expert's "hands-on experience" with hostage situations, the plaintiffs have been able to document only two hostage situations in which Katsaris has been involved, and even the documentation for these two leaves some doubt as to the degree of Katsaris' personal involvement in the resolution of the situations. In addition, plaintiffs fail to show any training or educational background in hostage negotiations other than reading done by Katsaris on his own initiative.

Plaintiffs submitted documentation for two instances of hostage negotiations in which Katsaris was said to take part. Leaving aside the question of the extent of his involvement in these two incidents, the Court questions the qualifications of the expert based on only two experiences. Plaintiffs argue that Katsaris' inability to specifically recall any other incidents has no bearing on his qualifications, but the Court explicitly requested documentation of his exact experiences. Katsaris alleged that he had been involved in "probably 10 to 12" hostage situations. Plaintiffs' failure to document more than two instances is significant in light of the Court's request.

In regard to the specific situations cited by plaintiffs, even by Katsaris' account, his involvement was limited. In the first of two situations cited by plaintiffs, Katsaris participated in a hostage incident during his term as Sheriff of Leon County (Florida). According to evidence supplied by plaintiffs, Katsaris and a Tallahassee Police Department lieutenant talked a gunman into surrendering *after* the hostage had been released. The release of the hostage was negotiated by the police lieutenant according to the plaintiffs' evidence.

While this Court is required to view plaintiffs' evidence in the best possible light, it is not required to make great leaps of faith on behalf of plaintiffs. The evidence does not support a conclusion that Sheriff Katsaris had any role in negotiating the release of the hostage in that case.

In Katsaris' second reported incident, he advised the Secretary of the Florida Department of Corrections during a hostage situation at a Florida prison. Katsaris did not personally negotiate with the hostage takers and was not at the scene of the incident. Viewing the plaintiffs testimony in the most favorable light would suggest that Katsaris offered advice and suggestions to the Secretary of the Department of Corrections during the siege.

As to the other incidents which Katsaris vaguely recalls, but which plaintiffs were unable to document, Katsaris admitted in his deposition that he had not been at the command post for a barricaded gunman

incident more than four or five times. He recalls several situations where he was present at the scene, but was there only to assist in his capacity as a police officer, not to negotiate.

The Court finds that even giving his testimony full credence Katsaris has, at best, very limited experience in handling hostage situations.

The focus then shifts to Katsaris' training and education. Katsaris admits that he has never taken any course or training in the handling of hostage situations. He professes to have trained himself by reading and reviewing materials prepared by Frank Bowles and other unnamed experts. Katsaris' failure to take any courses or training in hostage negotiations over his extensive career as a police officer, and instructor, is inexplicable considering he professes deep professional interest in the field. Self-study and reading may form a sufficient basis for developing an expertise in some subjects, but this Court possesses considerable latitude to determine what constitutes a sufficient basis for expertise in this field. *United States v. An Article of Drug*, 661 F.2d 742 (9th Cir.1981). A course of self-study is not adequate, in the opinion of this Court, to create an expert. Absent other indications of expertise, the Court has no way to determine the extent or depth of the proposed expert's self-study. Therefore, this Court holds that in the absence of other indicia of expertise, self-study is insufficient to establish Katsaris as an expert.

Having found Katsaris not qualified by education alone, the Court then asks whether his self-study program combined with his practical experience is sufficient. This Court does not find Mr. Katsaris' experience to be broad enough to compensate for the deficiencies observed in his education. Katsaris is held not to be an expert witness as a matter of law.

### B.

■ The Court further finds that assuming Katsaris is qualified as an expert in hostage situations, the only portion of his testimony relevant to this motion would be his opinion that these acts were committed with a reckless disregard for the life of Taylor such that it shocks the conscience of the Court. Katsaris reaches this conclusion upon facts which do not otherwise support this conclusion, and constitute a conclusion of law, not of fact. The Court finds that this conclusion would not be helpful to the finder of fact and that the conclusory opinion is not admissible.

■ The standard of whether an expert's testimony will be permitted is whether the testimony is "likely to assist the trier of fact in arriving at the truth". *United States v. Barker*, 553 F.2d 1013 (6th Cir. 1977). In this case, Katsaris' testimony is being offered not to assist in reaching conclusions of fact but rather of law. While experts may testify to conclusions of law, Katsaris' only assistance to the trier of fact is to make a suggestion as to the outcome of the ultimate issue. The Court finds this to be more akin to advocacy than testimony. The proper place for plaintiffs to make suggestions on the ultimate issue is in the statements and arguments of their attorney. Katsaris, who is paid by the plaintiff and presumably has an interest in the success of this litigation, acts as an additional advocate in this case because his testimony will not assist the finders of fact in determining the facts.

### IV.

■ The Court further finds that, even if Katsaris's testimony is admitted, the plaintiffs have failed to present a genuine issue of material fact. The facts upon which Katsaris based his opinion are the same set of facts presented to this Court. The Court is amply able to reach its own inferences from the uncontested facts. The Court finds no genuine issues of fact in this case but is not surprised that plaintiffs were able to hire an expert who could reach conclusions that would support their lawsuit. Katsaris's conclusions are not supported by the facts presented in this matter and his opinions and theories are not sufficient, absent other evidence, to create an issue of fact.

Plaintiffs indicate that they may create an issue of fact if they contest whether the bullet which struck Taylor in the head was fired by Freeman or by a member of the Ferndale Police Department. The Court finds that the mere suggestion that plaintiffs might present evidence in opposition to the defendants' evidence that Freeman's gun fired the shot is not sufficient to create a factual issue. Plaintiff must offer the evidence through an affidavit or deposition. Mere suggestion of a possible issue does not create a genuine issue of fact. *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## V.

Having found no genuine issues of material fact, the Court finds that plaintiffs fail to state a claim upon which relief may be granted. This matter presents a novel question in the history of constitutional torts. No other hostage situations have resulted in 42 U.S.C. § 1983 actions which have been reported. The Court is troubled by the suggestion that the police may be liable in tort every time they are unable to rescue a person from a dangerous situation. It is in the nature of police work that the pressure becomes intense and decisions must be made quickly. Decisions of policemen on the scene may be questioned and pondered after the fact, but the decisions made on the spot do not permit such reflection. Inevitably, policemen make mistakes. Such mistakes made in the best judgment of the trained police officer should not be the province of constitutional tort suits.

The Supreme Court recently supported this idea in *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In *Daniels* the Supreme Court traced the history of § 1983 and concluded that the purpose of the statute was not to provide a tort remedy for every person injured by the government. The Court held that a mere lack of due care by an official could never constitute a deprivation under § 1983. It declined to indicate whether any act short of an act intended to harm could present a constitutional tort.

The Court finds the *Daniels* opinion provides some guidance in the instant case. This matter presents no evidence that the police acted with an intent to harm Ms. Taylor or that they acted in reckless disregard for her safety. Whether the police chose the the best or even a good course of action does not matter. Mere negligence is not sufficient to create a liability.

The Court also relies upon two lines of cases which are in some ways analogous to the instant case. The first of these are cases where public officials were sued for failing to rescue a person from danger. The second are cases where individuals allege the government is liable for the malpractice of government employed doctors. In both cases the courts have found that no deprivation without due process of law occurred.

In *Jackson v. City of Joliet,* 715 F.2d 1200 (7th Cir.1983) and *Jackson v. Byrne,* 738 F.2d 1443 (7th Cir.1984), the plaintiffs allege that the constitutional rights of their deceased were violated when police or fire officials failed to save them. In *Jackson v. City of Joliet* a policeman negligently failed to assist two injured persons in a wrecked car. Plaintiffs alleged that the decedents could have been saved if medical assistance had been given sooner. The Court reviewed the history of § 1983 and concluded that no right to be rescued existed under the Fourteenth Amendment and that failure to rescue a person did not comprise a constitutional tort. Similarly, in *Jackson v. Byrne,* the Seventh Circuit found that the failure of city firefighters to rescue two children from a fire did not give rise to a successful § 1983 claim.

■ These cases are very similar to the instant case. Here the police acted to rescue Taylor but did not succeed. The Court finds that failure to successfully rescue an endangered person does not constitute a deprivation of a liberty interest.

A second line of analogous cases are those which consider whether a government employed physician can be held to have committed a constitutional tort by committing malpractice. In *Bowers v. De-Vito,* 686 F.2d 616 (1982), the Seventh Cir-

cuit considered a case where a woman was murdered by a man who was released from a state mental hospital. The former patient had a history of assault and had killed a young woman with a knife in 1971. He was found not guilty by reason of insanity in the death of the young woman and was committed to the Madden Mental Health Center. He was released in 1975 and a year later he murdered Bowers with a knife. This suit was brought by her estate claiming that the defendants knew that the patient was dangerous when they released him and had acted recklessly in letting him go. The Court found that there is no constitutional right to be protected by the state against being murdered by criminals or madmen. *Id.* at 618. The Court further found that malpractice is not actionable under § 1983. Consequently, the dismissal of the § 1983 claim was affirmed.

*Bowers* is closely analogous to the instant case. Plaintiffs allege that the Ferndale Police both collectively and through the actions of individual officers failed to protect Taylor from Alvin Freeman. However, no duty to protect her from Freeman existed. In the absence of such a duty, the Court finds that this further supports the conclusion that plaintiffs have failed to state a claim under § 1983.

### VI.

Finally, the Court takes into consideration the policy implications of a finding of liability in this case. The police in this instance responded to an emergency call which could have presented a tremendous variety of hazards and decisions. The police responded to the call and those persons on the scene appear, from the facts presented to the Court by both plaintiffs and defendants, to have acted in their best judgment. That the results of this situation was a tragedy does not reflect upon the good faith efforts or judgment of the officers involved. Had the officers waited longer and attempted further negotiation the result might also have been tragic.

An example of the results of waiting and negotiating is the result of the recent hostage situation on Rodeo Drive in Beverly Hills, California. There the police negotiated overnight with the barricaded hostage taker and two hostages were killed before the gunman attempted to leave the building. Los Angeles Times, June 25, 1986, Part 1, Page 1, Column 2. This situation could easily lead to a lawsuit alleging that the police erred by not storming the building early on. This type of litigation poses a no-win situation for the police and does nothing to encourage effective law enforcement or a respect for constitutional rights. Since the fundamental purpose of § 1983 is to provide a vehicle to enforce constitutional rights, no action under § 1983 ought to be recognized under these circumstances.

The Court holds that upon the facts and the related authority plaintiffs have failed to create a genuine issue of fact as to whether defendants' conduct is shocking to the conscience of the Court and summary judgment shall be granted as to her substantive due process claim.

### VII.

Because plaintiffs have failed to allege a deprivation of Taylor's constitutional rights, defendants' motion for summary judgment is granted. An appropriate order will be entered.