Carmen A. MALIGNAGGI, General Administrator of the Estate of Joseph L. Malignaggi, Jr., and Carmen A. Malignaggi, as Administrator Ad Prosequendum of the Estate of Joseph L. Malignaggi, Jr., deceased, Joseph L. Malignaggi, Erminia Malignaggi, individually, and Carmen A. Malignaggi, individually, Plaintiffs,

v.

COUNTY OF GLOUCESTER, Gloucester County Swat Team, Gloucester County Police Chief's Association, Gloucester County Prosecutor's Office, State of New Jersey, Officer Greg Sherwood, West Deptford Police Department, Chief of the West Deptford Police Department, Township of West Deptford, Officer Joseph Cella, Washington Township Police Department, Chief of the Washington Township Police Department, Township of Washington, Officer David Haas, Officer Francis Grogan, Paulsboro Police Department, Chief of the Paulsboro Police Department, Borough of Paulsboro, Officer Michael Smith, Logan Police Department, Chief of the Logan Police Department, Township of Logan, Woodbury Police Department, Chief of the Woodbury Police Department, City of Woodbury, Officer John Stevenson, Westville Police Department, Chief of the Westville Police Department, Borough of Westville, Officer Scott Penuel, Pitman Police Department, Chief of the Pitman Police Department, Borough of Pitman, Officer Michael O'Donnell, Franklin Township Police Department, Chief of the Franklin Township Police Department, Township of Franklin, Harrison Township Police Department, Chief MacCherone,

Township of Harrison, John Does 1–10, fictitious names, person or persons, corporate, municipal or State agencies, Defendants.

No. 92–cv–2924.

United States District Court,
D. New Jersey.

June 24, 1994.

John C. Eastlack, Jr., Poplar & Eastlack, P.A., Turnersville, NJ, for plaintiffs.

Richard P. Cushing, Gebhardt & Kiefer, Clinton, NJ, Marc I. Bressman, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, Cherry Hill, NJ, Frank N. Yurasko, Somerville, NJ, for defendants.

## OPINION

BROTMAN, District Judge:

Presently before the court are the motions of defendants for summary judgment. For the reasons set forth below, the motions are granted.

## I. FACTS

The following facts are undisputed. On November 17, 1990, plaintiffs' decedent, Joseph Malignaggi, took two waitresses hostage with a rifle in a Harrison Township restaurant. No one knew that the rifle was unloaded. He ordered everyone but the waitresses to leave the restaurant, and ordered one patron to chain and lock the front doors on his way out.

The Gloucester County SWAT team, which consists of volunteer officers from police departments across Gloucester County, arrived at the scene and took control of the situation. They were briefed on the situation by Chief Maccherone of the Harrison Township Police Department. The team was also informed by Malignaggi's family that he had a history of mental illness.

Officer O'Donnell served as the negotiator, while Officer Sherwood served as team leader. Through most of the night, O'Donnell unsuccessfully attempted to communicate with Malignaggi. In order to increase the pressure on Malignaggi, as well as facilitate communication, Sherwood ordered officers to break the front window. At the same time and unbeknownst to O'Donnell, Sherwood ordered two officers, Smith and Grogan, to enter the restaurant.

The two officers hid in the kitchen. Sherwood subsequently noticed that the hostages were positioned at or near the kitchen doors, so he motioned the waitresses to move toward the doors. Malignaggi caught the waitresses' movement and became visibly agitated. Alarmed, Sherwood ordered Smith and Grogan by radio to rescue the hostages. When they entered the dining area, Malignaggi pointed the rifle at them, and the officers shot and killed him.

Plaintiffs filed suit against the SWAT team, its members, their police departments, police chiefs, and municipalities, the Gloucester County Police Chief's Association, and the Gloucester County Prosecutor's Office under 42 U.S.C. § 1983 and for negligence. In their briefs, plaintiffs have conceded non-liability on the part of all officers except for Smith, Grogan, Sherwood, and O'Donnell, as well as all of the police departments.

## II. LEGAL DISCUSSION

### A. Summary Judgment Standard

■ The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986); Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983), cert. dism'd, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### B. *Section 1983 Claims*

#### 1. *The Municipal Defendants*

■ In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court recognized the availability of Section 1983 liability against municipal entities for customs and policies that they institute. Yet the Supreme Court sharply circumscribed municipal exposure by precluding liability based on the acts of its employees, that is, on a *respondeat superior* theory. Thus, a municipality cannot be held liable where an employee unconstitutionally applies a facially valid policy. *Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

■ A caveat to this rule is that if the unconstitutional application resulted from the city's failure to train the employee adequately, the city may be held liable under Section 1983. *Id.* Importantly, mere negligence in training will not create a Section 1983 claim. Instead, the failure to train must amount to "deliberate indifference" to the rights of persons with whom the police come into contact. *Id.* at 388, 109 S.Ct. at 1204.

It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390, 109 S.Ct. at 1205.

For example, municipalities know that their police officers will be required to arrest fleeing felons and have armed them to accomplish that task. Therefore, a clear need to train the officers on the constitutional limitations of the use of deadly force would exist. *Id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10 (citing *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

■ To sustain an inadequate training theory, plaintiff must (1) identify the deficiency; (2) prove that the deficiency caused the alleged constitutional violation; and (3) prove that the failure to remedy the deficiency reflected deliberate indifference on the part of the municipality. *See id.,* 489 U.S. at 391, 109 S.Ct. at 1206; *Colburn v. Upper Darby Township,* 946 F.2d 1017 (3d Cir.1991).

A sufficiently close causal link must be shown between inculpating training deficiency or deficiencies and specific violation. This requires first that a specific deficiency rather than general laxness or ineffectiveness in training be shown. It then requires that the deficiency or deficiencies be such, given the manifest exigencies of police work, as to make occurrence of the specific violation a reasonable probability rather than a mere possibility. That is, the specific violation must be 'almost bound to happen sooner or later' rather than merely 'likely to happen in the long run.'

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987). "The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue." *Oklahoma City v. Tuttle*, 471 U.S. 808, 824–25 n. 8, 105 S.Ct. 2427, 2436–37 n. 8, 85 L.Ed.2d 791 (1985).

Furthermore, "[i]n order to meet the deliberate indifference standard [plaintiff] must present scienter-like evidence of indifference on the part of a particular policymaker or policymakers." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1060–61 (3d Cir. 1991).

> [A] municipality's deliberately indifferent failure to train is *not* established by (1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct.

*Id.* at 1060.

■ Proof of a single violation will not support the inference that the municipality possessed scienter-like knowledge. *See id.* at 1063, n. 18; *see also Tuttle*, 471 U.S. at 823–24, 105 S.Ct. at 2436–37.

■ Plaintiffs argue that the defendant municipalities and related entities knew or should have known that the SWAT team would encounter hostage-takers, and acted with deliberate indifference in failing to train for such a contingency.[1] The evidence they adduce in support of their claim is (1) that the training supervisor, Michael O'Donnell, was not a regular member of the SWAT team; and (2) that Chief Hoelbinger, the managing police chief, was unqualified to evaluate the training needs for the SWAT team, and "did not even know the qualifications of the person to whom such training was entrusted," Officer O'Donnell. Pl. Opp.Br. at 7.[2] As a result, plaintiffs argue, the SWAT Team unnecessarily confronted Malignaggi, contrary to professional standards of action and SWAT team operating procedures. *Id.*

Such evidence, without more, is insufficient to establish an inadequate training claim under Section 1983. Plaintiffs have failed to identify a specific training deficiency which caused the alleged violation. Nor can plaintiffs point to any evidence that defendants acted with "deliberate indifference" to Malignaggi's rights. In fact, plaintiffs' own expert witness does not fault defendants' training procedures.

Moreover, even if the SWAT team had been inadequately trained, defendant municipalities had neither actual nor constructive notice of a deficiency because the Gloucester County SWAT team had never before been confronted with a "classic" hostage-taking situation. Deposition of Captain Michael O'Donnell at 64–65. Accordingly, they cannot be liable under Section 1983 on an inadequate training theory. *See Fulkerson v. City of Lancaster*, 801 F.Supp. 1476, 1483 (E.D.Pa.1992).

Plaintiffs have failed to establish an inadequate training claim under Section 1983. Accordingly, the Section 1983 claims against the police chiefs, the Gloucester County Police Chief's Association, the County of Gloucester, the Gloucester County Prosecutor's Office, the Gloucester County SWAT Team, and the

---

1.  Plaintiffs allege that the municipal-related entities, including Gloucester County Police Chiefs Association, the SWAT Team, and the Gloucester County Prosecutor's Office, as well as Gloucester County and the municipalities, were responsible for the training of the SWAT Team. Pl.Opp.Br. at 6. For purposes of this motion, the court will consider this allegation as true.

2.  Plaintiffs also rely on alleged testimony from Officer O'Donnell "that following his departure as 'team leader' of the SWAT Team, there was never any review by himself of any training outside of monthly training and to his knowledge no such training existed." *E.g.*, Pl.Opp.Br. at 10 (citing Deposition of Michael O'Donnell, July 1, 1993, at 44–45). Upon review of the record, the court could not find the pages referenced, and thus this alleged testimony is without support. Even if supported, this testimony would not change the decision reached today.

individual municipalities are dismissed with prejudice.

## 2. *The Police Officers*

In addition to the municipalities and municipal-related entities, plaintiffs have sued Officers Sherwood, Grogan, and Smith.[3] Plaintiffs contend that the officers acted in bad faith when they knowingly and intentionally violated SWAT team policy by entering the restaurant where the hostages were held. According to plaintiffs, Mr. Malignaggi "was not threatening to, or actually inflicting harm upon himself or anyone else." Pl.Opp.Br. at 11.

■ Qualified immunity to suit is available to police officers under Section 1983. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The purpose of imposing the qualified immunity doctrine is to "provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (citing *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)).

■ The Supreme Court has "emphasized that qualified immunity should be resolved at the earliest possible stage of a litigation" in order to avoid the " 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" *Id.*, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6. Determining whether qualified immunity applies is a question for the court where factual issues are undisputed. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

■ In determining whether a police officer may successfully raise the shield of qualified immunity, the court must engage in a two-step analysis. First, the court must determine whether plaintiffs have established a constitutional claim. The court must then determine whether the officer's conduct was objectively reasonable given the legal rules clearly established at the time. *Anderson,*

483 U.S. at 639, 107 S.Ct. at 3038. Only when the contours of a right are sufficiently clear so that a reasonable officer would understand that his conduct violates that right will a right be considered clearly established. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent." *Id.* at 640, 106 S.Ct. at 2730. "If reasonable public officials could differ on the lawfulness of defendant's actions, the defendant is entitled to qualified immunity." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir.1990) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

■ Not surprisingly, research reveals no case in which a hostage-taker or his estate has sued public officials for their actions in rescuing the hostages. However, two cases from the Fifth and Ninth Circuits are instructive. In *Salas v. Carpenter*, 980 F.2d 299 (5th Cir.1992), a county sheriff commanded a failed rescue attempt which resulted in the hostage's death. Prior to the rescue attempt, the sheriff had ordered the city SWAT Team to leave the scene, and replaced it with his own county personnel, who were untrained in hostage situations.[4]

The court found that while Carpenter's attempt "to negotiate Hermosillo's release with inexperienced deputies and untrained civilians ... may have been imprudent, even reckless ... a reasonable official would [not] recognize that it was contrary to law." *Id.* at 311. The court noted that

[a]n important policy behind qualified immunity is to prevent litigation which 'will unduly inhibit officials in the discharge of their duties.' *Creighton*, 483 U.S. at 638, 107 S.Ct. at 3038. Second-guessing the decision of law enforcement officers regarding the choice of police personnel in a crisis would undermine that policy. Lawsuits alleging that police should have acted

---

3. While not entirely clear from the complaint, plaintiffs indicated at oral argument that they are suing the officers in both their individual and official capacities.

4. Plaintiffs alleged that Sheriff Carpenter's actions were "motivated by his ego, his jealousy of the courthouse, and professional envy of the police department." *Salas*, 980 F.2d at 303.

one way or another in response to a hostage situation 'pose[ ] a no-win situation for the police and do[ ] nothing to encourage law enforcement or a respect for constitutional rights.' *Taylor v. Watters,* 655 F.Supp. 801, 807 (E.D.Mich.1987).

*Id.* (citations abridged).

In *Medrano v. Los Angeles,* 973 F.2d 1499 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2415, 124 L.Ed.2d 638 (1993), decedent Medrano left a suicide note, locked himself in a bathroom with a gun, injected himself with a lethal dose of heroin, and threatened to kill anyone who tried to prevent his suicide. The family called police, who sought, unsuccessfully to negotiate with Medrano. *Id.* at 1501. Once he fell asleep, police forced their way into the bathroom. *Id.* Medrano woke up, fired at the police, and struggled with them for possession of the gun. *Id.* at 1501–02. Medrano was shot and killed in the altercation. *Id.* at 1502.

His relatives sued police and the city under Section 1983 alleging that the police used excessive force. *Id.* The Ninth Circuit found that there was no evidence indicating that the police "knew or should have known" that forced entry would violate Medrano's civil rights. *Id.* at 1504. The court concluded that "[w]ithout some evidence that the on scene supervisors authorized use of excessive force," the decision to make a forced entry could not support a judgment in plaintiffs' favor. *Id.*

Similarly, in this situation, Officers Sherwood, Grogan, and Smith acted reasonably. While Officer Sherwood's spontaneous decision to send Grogan and Smith into the building may have been, as plaintiffs' expert claims, "premature," no objectively reasonable police officer would believe that such decision would violate a hostage-taker's civil rights.[5] *See id.* Moreover, Officer Sherwood did not authorize the use of excessive force at any time. *See id.* Indeed, Malignaggi was not shot until he pointed his rifle at police.

"That the results of this situation was (sic) a tragedy does not reflect upon the good faith efforts or judgment of the officers involved. Had the officers waited longer and attempted further negotiation the result might also have been tragic." *Taylor,* 655 F.Supp. at 807. Moreover, as the First Circuit noted in a suit by a hostage accidently shot by police:[6]

> To hold that shooting in such circumstances violates the constitutional rights of a hostage whom the officers are trying to free would be to hamstring seriously law enforcement officers in their efforts to re-

---

5. Plaintiffs' expert opined that because negotiations were ongoing and "no imminent threat to the safety of the hostages" existed, the rescue attempt was "unnecessarily premature." Exhibit I, Pl.Opp.Br., at 7–8. However, as the Supreme Court has noted, "[a]n expert's after-the-fact opinion that danger was not 'imminent' in no way establishes that there was no danger, or that a conclusion by the officers that it *was* imminent would have been wholly unreasonable" in a hostage situation. *Whitley v. Albers,* 475 U.S. 312, 323, 106 S.Ct. 1078, 1086, 89 L.Ed.2d 251 (1986).

Plaintiffs also fault defendant police officers for allegedly violating Team Policy on handling "barricade" situations. The policy states that "[t]ime is of no importance in removing a barricaded person, unless there is an immediate danger to life." Exhibit A, Pl.Opp.Br., at 4. It further provides that "[n]o force of any kind shall be used except as a last resort." *Id.* at 5.

Assuming its applicability to hostage situations, as plaintiffs contend, the policy provides ample justification for defendants' actions. Standard operating procedure for Officer Sherwood, the team commander, was "to talk the perpetrator out into the open for apprehension or to drive him out if chemical weapons can be safely utilized. *When this is not possible, an assault team will have to enter the building." Id.* at 3 (emphasis added). The policy thus recognizes the need for entry under the circumstances present in this case.

The policy also provides that an officer may not enter the barricaded building or the same room with a barricaded person without permission of the team commander. *Id.* at 4–5. Here, Officer Sherwood directed the two officers into the building and into the room in which Malignaggi held the two hostages. Thus, Officers Smith and Grogan followed Team Policy in all pertinent respects.

6. Significantly, courts have unanimously rejected suits by hostages against police on either qualified immunity or absence of constitutional claim grounds. *See, e.g., Salas v. Carpenter, supra; Landol–Rivera v. Cruz Cosme,* 906 F.2d 791 (1st Cir.1990); *Taylor v. Watters, supra.* The perversity of allowing hostage-takers to sue under Section 1983 while precluding similar suits by hostages is manifest.

solve explosive situations. It is inevitable that the police response to violent crime will at times create some risk of injury to others, including innocent bystanders. We decline to hold that the mere presence of risk reflects a callous indifference to the constitutional rights of those individuals potentially harmed. Any other conclusion would both chill law enforcement officers in the performance of their duties and encourage hostage-taking and criminal activity in public settings so as to minimize police intervention.

*Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 797 (1st Cir.1990); *see also Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (recognizing the difficulties inherent in confronting a hostage situation).

Accordingly, the court finds that even if plaintiffs have stated a cognizable constitutional claim, Officers Sherwood, Grogan and Smith enjoy qualified immunity and thus the claims against them will be dismissed with prejudice.

### 3. *Officer O'Donnell and Chief Maccherone*

 Plaintiffs also assert claims against Officer O'Donnell and Chief Maccherone. To be liable under Section 1983, an individual must have played an "affirmative part" in the conduct which violated plaintiff's civil rights. *Chinchello v. Fenton,* 805 F.2d 126, 133 (3d Cir.1986) (citing *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976)). Here, Chief Maccherone's participation was limited to briefing the SWAT team when they arrived at the hostage scene. Officer O'Donnell, while more actively involved, did not participate in the decision to send Officer Smith and Grogan into the building. Accordingly, they cannot be held liable under Section 1983 and the claims against them will be dismissed with prejudice.

### C. *State Law Claims*

The court has exercised pendent jurisdiction over plaintiffs' state law claims by virtue of the federal Section 1983 claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Because the Section 1983 claims have been dismissed with prejudice, the remaining state law claims will be remanded to the state court of original jurisdiction. *See Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 351–52, 108 S.Ct. 614, 619–20, 98 L.Ed.2d 720 (1988) (holding that when the underlying federal claim is dismissed, district court has discretion to remand remaining pendent claims of previously-removed case to state court).

### III. *CONCLUSION*

The motions for summary judgment are granted and the Section 1983 claims are dismissed with prejudice against all defendants. The remaining state law claims will be remanded to the state court of original jurisdiction.