Mark T. CARROLL, Plaintiff,

v.

BOROUGH OF STATE COLLEGE, et al., Defendants.

No. 3:CV–92–1000.

United States District Court, M.D. Pennsylvania.

June 27, 1994.

by a police vehicle. The pursuit began when Corporal Buddy C. Dorman of the State College Borough Police observed Carroll pass another vehicle on the right hand side while exceeding the posted speed limit. Cpl. Dorman observed Carroll doing forty miles-per-hour in a twenty-five-mile-per-hour zone.

Cpl. Dorman fell in behind the motorcycle so that he could clock its speed with VAS-CAR. As he did so, the motorcycle proceeded through a red light. At that point, Cpl. Dorman activated his cruiser's siren and overhead lights, signaling the motorcycle operator to pull over. The operator did not stop, but sped up. Cpl. Dorman followed the motorcycle along Borough and township streets for about three miles. He radioed police headquarters that he was in pursuit of a motorcyclist who had committed a traffic violation. At times during the chase, the motorcycle and the pursuing police car reached speeds of up to seventy or eighty-five miles-per-hour.

The chase came to an end when the motorcycle failed to negotiate a curve and crashed. Carroll sustained serious, permanently disabling injuries in the crash.

Cpl. Dorman was the only police officer involved in the pursuit. Other officers arrived on the scene after the accident, but did not participate in the pursuit.

Carroll filed this action against Cpl. Dorman; the State College Chief of Police, Elwood G. Williams, Jr.; and the Borough of State College (the Borough).[2] He alleges the violation of his civil rights under the Fourth, Fifth and Fourteenth Amendments (Counts I, II and III) based on Cpl. Dorman's pursuit. His allegations of liability against the Borough are based on a *Monell*[3] claim grounded in an alleged failure to train its police officers in pursuit techniques and to adopt more restrictive policies against such pursuits.

Gary B. Gilman, Barry L. Gross, Clyde W. Waite, Stief, Waite, Gross & Sagoskin, Newton, PA, for plaintiff.

Hugh J. Hutchison, Leonard, Tillery & Davison, Dennis P. Lynch, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for defendants.

**MEMORANDUM**

McCLURE, District Judge.

**BACKGROUND**

Plaintiff Mark T. Carroll filed this section 1983[1] action to recover for injuries which he sustained during the early morning hours of July 27, 1990 when the motorcycle which he was operating crashed while being pursued

1. 42 U.S.C. § 1983.

2. Plaintiff initially sued T.E. Dann, R.F. Ososkie, and other officers of the State College Borough Police designated as Richard Roe and John Doe. Those defendants were dismissed from the action

pursuant to the court's order dated July 15, 1993 (Record Document No. 16).

3. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In addition to the federal claims, Carroll alleges three pendent state claims: 1) willful misconduct under 42 Pa.Cons.Stat.Ann. § 8550 (Count IV); 2) negligence *per se* for the alleged violation of 75 Pa.Cons.Stat.Ann. § 3105 (Count V); and 3) reckless disregard for plaintiff's safety (Count VI).

Defendants filed a motion for summary judgment (Record Document No. 7) on all claims. Our ruling on defendants' motion was deferred [4] pending reconsideration of the Third Circuit panel decision in *Fagan v. City of Vineland,* Nos. 92–5481, 92–5482, 92–5551 and 92–5594, slip op., 1993 WL 290386 (3d Cir. August 5, 1993) (*Fagan I* ), appealing, 804 F.Supp. 591, 606 (D.N.J.1992).

Reargument was granted before the court *en banc,* 5 F.3d 647 (3d Cir.1993), on the question of the standard to be applied in judging the conduct of the police pursuing a suspect under a claimed Fourteenth Amendment violation.

Following reargument, two opinions were issued: 1) an opinion by the court *en banc* setting forth the standard of liability in a police pursuit action grounded in the Fourteenth Amendment, *Fagan v. City of Vineland,* (*Fagan II—en banc* ), 22 F.3d 1283 (3d Cir.1994); and 2) an opinion by the original panel, reaffirming its earlier reversal of the district court's grant of summary judgment in favor of the city, *Fagan v. City of Vineland,* (*Fagan II—panel* ), 22 F.3d 1283 (3d Cir.1994).

Issuance of the *Fagan en banc* opinion resolved the uncertainty over the standard to be applied in police pursuit cases in this circuit. We, therefore, lift the stay entered pending issuance of that decision and will now rule on the pending motions.

In addition to defendants' motion for summary judgment, there are pending: 1) plaintiff's motion to supplement his memorandum in opposition to defendants' summary judgment motion (record document no. 30); 2) defendants' motion for separate trials (record document no. 18); 3) plaintiff's motion in limine (record document no. 22); and 4) defendants' motion in limine (record document no. 29).

For the reasons discussed below, we will enter an order granting summary judgment in favor of all defendants on all of plaintiff's federally based claims (Counts I, II and III). All other pending motions will be denied as moot. Plaintiff's state law claims (Counts IV, V and VI) will be dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

## DISCUSSION

### Summary judgment standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 323 and 325, 106 S.Ct. at 2552 and 2554.

---

4. Record document no. 38.

■ Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693–94 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir.1988).

**Fourth Amendment claim**

■ To prevail on a cause of action under section 1983, a plaintiff must prove that the conduct of a state actor deprived him of a right, privilege, or immunity secured by the United States Constitution or the law of the United States. *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). No one disputes that Cpl. Dorman was acting under color of state law during the pursuit. What is in contention is whether plaintiff's federal rights were violated.

■ Carroll alleges the violation of his Fourth, Fifth, and Fourteenth Amendment rights. The Fourth Amendment protects citizens against unreasonable searches and seizures by law enforcement authorities. To state a cause of action under the Fourth Amendment, a plaintiff injured during, or as a result of, a police pursuit must establish that the pursuit was a "seizure" by the law enforcement officer and that the officer's conduct was unreasonable. *Galas v. McKee*, 801 F.2d 200, 202 (6th Cir.1986).

■ What constitutes a seizure was defined by the United States Supreme Court in *United States v. Mendenhall*, 446 U.S. 544, 552–53, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). The Court stated:

> ... [N]ot all ... [contact] ... between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen ... [has] ... a 'seizure' ... occurred.
>
> ....
>
> ... [A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.

*Id.,* 446 U.S. at 552–53, 100 S.Ct. at 1877 (1980) (Citations omitted.)

The Supreme Court elaborated in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), stating:

> Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking ... but the detention or taking itself must be willful....
>
> .... It is clear that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement ... nor even whenever there is a governmental and governmentally desired termination of an individual's freedom of movement through means intentionally applied. That is the reason there was no seizure in the hypothetical situation that concerned the Court of Appeals.

*Id.,* 489 U.S. at 595–96, 109 S.Ct. at 1381.

The hypothetical situation to which the Court referred was a police pursuit "in which the suspect unexpectedly loses control of his car and crashes." With respect to that scenario, the Supreme Court stated that it would find "no unconstitutional seizure", because:

> The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means—his loss of control of his vehicle and the subsequent crash.

*Id.,* 489 U.S. at 597, 109 S.Ct. at 1381.

The Court contrasted such circumstances with those in which a seizure does occur, stating:

If, instead of ... [merely pursuing the suspect] ... the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

*Id.*, 489 U.S. at 597, 109 S.Ct. at 1381. See also: *California v. Hodari D.*, 499 U.S. 621, 625, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690, 697 (1991) (A show of authority by the police which is ignored by the fleeing suspect does not constitute a seizure. "An arrest requires either physical force ... or, where that is absent, submission to the assertion of authority." Emphasis original.) and *Michigan v. Chesternut*, 486 U.S. 567, 572–76, 108 S.Ct. 1975, 1978–81, 100 L.Ed.2d 565 (1988) (Police car driving parallel to individual fleeing on foot does not constitute a "seizure" under the Fourth Amendment.)

Although the Supreme Court's analysis of a hypothetical situation is *dicta*, it illustrates how the Court would probably rule if confronted with the factual scenario presented here. Based on the statements made in *Brower, supra*, it seems clear that the Court would hold that police pursuit of a fleeing vehicle does not constitute a seizure under the Fourth Amendment absent additional circumstances, such as evidence that the police erected a roadblock which it made virtually impossible for the vehicle to stop without injury to the occupants, or took some other direct or intervening action to halt the vehicle in a violent or sudden manner likely to cause injury to the occupants. See: *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (The use of deadly or excessive force to apprehend a fleeing suspect constitutes a Fourth Amendment seizure.).

Consistent with the Supreme Court's rulings in *Mendenhall, supra*, and *Brower, supra*, the federal courts have unfailingly held that police pursuit of a fleeing vehicle is not a seizure under the Fourth Amendment, absent some aggravating circumstance. See, e.g., *Horta v. Sullivan*, 4 F.3d 2, 10–11 (1st Cir.1993); *Cole v. Bone*, 993 F.2d 1328, 1332–33 (8th Cir.1993); *Galas, supra*, 801 F.2d at 202–03; *Keller v. Truska*, 694 F.Supp. 1384 (E.D.Mo.1988); *Roach v. City of Fredericktown*, 693 F.Supp. 795 (E.D.Mo.1988), *aff'd*,

882 F.2d 294 (8th Cir.1989); and *Tagstrom v. Pottebaum*, 668 F.Supp. 1269, 1273 n. 3 (N.D.Iowa 1987), *reversed in part on other grounds, Tagstrom v. Enockson*, 857 F.2d 502 (8th Cir.1988). This has been the ruling, whether the claimant is the fleeing suspect injured by his own failure to halt or is an uninvolved third party injured by the fleeing vehicle or the pursuing police cruiser. See, e.g., *Jones v. Sherrill*, 827 F.2d 1102 (6th Cir.1987), questioned on other grounds, *Pleasant v. Zamieski*, 895 F.2d 272, 275 n. 1 (6th Cir.1990), *cert. denied*, 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990); *Chesney v. Hill*, 813 F.2d 754 (6th Cir.1987) and *Allen v. Cook*, 668 F.Supp. 1460 (W.D.Okl.1987). Cf. *Troublefield v. City of Harrisburg*, 789 F.Supp. 160, 165 (M.D.Pa.1992) (District court declined to follow *Pleasant, supra*, on the grounds that it gave "short shrift to the heavy load of case decisions holding that accidental shootings in identical circumstances did not constitute seizures."), *aff'd per curiam*, 980 F.2d 724 (3d Cir.1992).

Only in cases in which the police took direct action to halt the fleeing vehicle in an abrupt manner likely to cause injury to the occupants or other persons have the federal courts held that a Fourth Amendment seizure can exist. *Tagstrom, supra*, 668 F.Supp. at 1273 n. 3. It is only when the fleeing suspect is forcibly halted that a seizure occurs and Fourth Amendment protections come into play. See: *California v. Hodari D., supra*, 499 U.S. at 625, 111 S.Ct. at 1550, 113 L.Ed.2d at 697.

In *Brower v. Inyo, supra*, for example, the police parked a tractor trailer across the road to block the path of the suspect's car. The fleeing driver had no chance of avoiding a collision with the police roadblock. The trailer was positioned just beyond a bend in the road. A police officer who had his cruiser positioned near the truck turned his lights off and on as he heard the suspect's car round the bend so that the driver was blinded by a sudden burst of light and had no chance of seeing the tractor-trailer until it was too late to avoid a collision. The Supreme Court held that the officers' conduct was sufficient to establish a Fourth Amendment seizure because their calculated efforts

to halt the vehicle gave the suspect no chance of avoiding a violent impact.

### Plaintiff's Fourth Amendment claim

The principal facts are undisputed. Cpl. Dorman followed the plaintiff for a distance of approximately three miles at speeds approaching, at times, seventy or eighty miles per hour.[5] The chase took place shortly before midnight on a Saturday evening. The distance between the fleeing motorcycle and the pursing police car varied during the chase from several blocks to fifty feet. (Record document no. 13, exhibit "E", Dorman deposition) Cpl. Dorman was travelling in a marked car with the siren and the lights activated during the pursuit. The pursuit began in the business district and ended in a less densely populated area, on Whitehall Road in College Township.[6]

Carroll's motorcycle ran off the road when he failed to negotiate a curve. At no time did the police cruiser come in contact with the motorcycle. Although Cpl. Dorman established radio contact with police headquarters, no other police vehicle joined in the pursuit or attempted to halt Carroll. Other vehicles converged on the scene after the accident occurred.

Plaintiff argues in his opposing brief that the facts, interpreted in the light most favorable to the plaintiff, support the conclusion that Cpl. Dorman "intended Carroll to crash" and operated his vehicle in a manner intended to bring about that result. (Record document no. 13 at p. 21) The facts of record do not support that conclusion. There is no evidence that Cpl. Dorman at any time struck plaintiff's motorcycle, attempted to sideswipe the motorcycle, or took any other action which caused plaintiff to lose control of the motorcycle. The only available evidence on the events immediately preceding the accident is the testimony of Cpl. Dorman himself. Carroll has no recollection of the accident and does not propose to submit expert testimony from an accident reconstructionist. Thus, conclusions about what occurred during the chase, and specifically, during the last few critical seconds before the crash, can be based only on Cpl. Dorman's recollection of what transpired and what his actions were at that time.

Cpl. Dorman testified that the crash occurred just as he was abandoning the chase. When asked by plaintiff's counsel whether, and at what point, he abandoned the chase, Cpl. Dorman replied in the affirmative and testified that he let the cyclist begin to pull away from him "approximately 500 feet or so prior to Whitehall Road" after getting close enough to read the license number. "At that point," he testified, "I backed off the gas and radioed the license plate to dispatch, turned the siren off and watched the vehicle continue ahead." (Record document no. 13, exhibit "E", Dorman deposition at pp. 57–58)

When questioned further on why he abandoned the chase at that point, Cpl. Dorman testified that:

> It wasn't risk that caused me to disengage. The reason I disengaged, as this thing had been going for quite some distance, my intention was to try to identify this person and once I was able to do so, there was no point in continuing because there was nothing I could do. I had the speed to get as close as I wanted to that motorcycle, but there was nothing more I could do than read the license number. So once I accomplished that I backed off and shut it off.

(Record document no. 13, exhibit "E", Dorman deposition at pp. 27–58)

 The only evidence of potential culpability on the part of Cpl. Dorman is his decision to initiate and continue the pursuit.

---

**5.** Cpl. Dorman's estimate of plaintiff's highest speed during the pursuit was seventy miles per hour. Plaintiff contends that the vehicles reached speeds of up to eighty-five miles per hour, but offers nothing to support that assertion. The highest speed reached by the vehicles is not a material fact, and we assume for purposes of deciding defendants' motion that the vehicles attained speeds in the seventy to eighty mile-per-hour range during the pursuit.

**6.** Cpl. Dorman testified that although College Township is outside the Borough, by contractual agreement, the State College Police Department patrols and provides police protection in the township. (Record document no. 13, exhibit "E", Dorman deposition at p. 57)

A map of the area is attached to plaintiff's brief, Record Document No. 13, as exhibit "G".

There is nothing which even remotely suggests that Cpl. Dorman drove his vehicle in a manner which caused the plaintiff to crash. His own testimony, the only evidence submitted on what occurred at the critical moment, suggests the exact opposite. Pursuit alone is plainly insufficient under Supreme Court precedent and its progeny to establish a Fourth Amendment seizure.

■ Even if the facts supported a finding of Fourth Amendment seizure, the second element necessary to establish a Fourth Amendment violation is lacking. Cpl. Dorman's conduct was not unreasonable. Police pursuit of a fleeing offender is not *per se* an unreasonable act. *Moyer v. Dunn County*, 691 F.Supp. 164, 172 (W.D.Wis.1988). Balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," the Sixth Circuit held in *Galas, supra*, 801 F.2d at 202, that "the use of high-speed pursuits by police officers is not an unreasonable method of seizing traffic violators."

■ The governmental and societal interests in such pursuits is obvious. If violators know that the police will make no effort to pursue them if they choose to flout the law and flee, the police would have a difficult time apprehending anyone who did not want to be stopped. All a driver would have to do is speed off, secure in the knowledge that he can flee with impunity. See generally: *California v. Hodari D., supra*, 499 U.S. at 627, 111 S.Ct. at 1551, 113 L.Ed.2d at 698. Unless the officer was quick enough to obtain the license number of the vehicle before it sped off, there would be no possibility of apprehension. While there are constraints on the reasonableness of police pursuits, those constraints were plainly not exceeded here.

Cpl. Dorman has stated that it was his intent to pursue the plaintiff until he could get his license plate number and then abandon the chase. He stated that he had just obtained the number and was in the process of backing off when the motorcycle crashed. Although plaintiff disputes these contentions, he has not produced any evidence which refutes them.

Even if Cpl. Dorman was not in the process of abandoning the pursuit as he states, his conduct was still not unreasonable. Carroll was driving erratically when Cpl. Dorman first spotted him. Carroll first attracted Cpl. Dorman's attention when he observed Carroll's motorcycle pass another vehicle on the right side in lane designated for parking, then continue past the car at a speed which appeared to be in excess of the legal limit. (Record document no. 13, exhibit "E", Dorman deposition at p. 31-38). It was just before midnight on a Saturday evening,[7] and Carroll pursued a route which led the two away from downtown State College and into a neighboring township. Under all of the circumstances, Cpl. Dorman did not act unreasonably.

Summary judgment will be granted in favor of defendants on plaintiff's Fourth Amendment claim (Count I).

### Due Process Claim

■ Carroll alleges a substantive due process claim on the ground that Cpl. Dorman's pursuit of him for a traffic violation along Borough streets and township roads at speeds approaching seventy or eighty-five miles per hour constituted excessive force.[8] Police pursuit of a fleeing suspect violates the substantive component of the Due Process Clause only if the pursuing officer's conduct "amounts to an abuse of official power such that it 'shocks the conscience.'" *Fagan II—en banc, supra*, citing *Collins v. City*

---

7. Record document no. 13, exhibit "E", Dorman deposition at p. 31.

8. Because we have found that there was no "seizure" and, hence, no claim under the Fourth Amendment, the Supreme Court's requirement, stated in *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 1867, 104 L.Ed.2d 443 (1989), that all claims invoking the Fourth Amendment be analyzed under that amendment only and not under a general substantive due process approach does not apply. Since we found that plaintiff has no claim under the Fourth Amendment, we are not precluded by *Graham, supra*, from considering whether he has a due process claim under the Fourteenth Amendment. See: *Fagan, supra*, 804 F.Supp. at 597.

*of Harker Heights,* ——— U.S. ———, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) and *Temkin v. Frederick County Commissioners,* 945 F.2d 716, 720 (4th Cir.1991), *cert. denied,* ——— U.S. ———, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992); and *Checki v. Webb,* 785 F.2d 534, 538 (5th Cir.1986). Thus, to recover on his Fourteenth Amendment claim, Carroll must establish that Cpl. Dorman's conduct shocks the conscience.

▉ The facts surrounding Cpl. Dorman's chase of plaintiff have been recited earlier in this memorandum.[9] There is no contention by plaintiff that at any time during the pursuit Cpl. Dorman attempted to overtake the motorcycle or force it off of the road. The crash occurred when the motorcycle failed to negotiate a curve.

A comparison of the facts presented here with those of other cases involving similar allegations compels the conclusion that Cpl. Dorman's conduct during the chase does not rise to the level of a due process violation. His conduct is no more egregious than that of the pursuing officers in *Fagan, supra,* which the Third Circuit held did not rise to the level of a constitutional violation. *Fagan II—en banc, supra.* The pursuit in *Fagan, supra,* began during the early morning hours of March 6, 1988 when officer David Tesoroni of the Vineland Police Department spotted a white Camaro travelling in the opposite direction along Vineland's main street, with a passenger standing up through the car's open T-top roof. Officer Tesoroni made a U-turn, followed the Camaro for a short distance and signalled the driver to pull over. Officer Tesoroni had not observed the operator committing any traffic violation, but merely wanted to warn the operator and his passengers not to ride in an unsafe manner.

The operator did not pull over when signalled, but instead sped up. The police cruiser did the same, and a chase began, during which the two vehicles approached speeds of seventy to eighty miles per hour while travelling along city streets. At some point during the chase, the Camaro turned off its lights. The pursuit continued through a residential neighborhood. During the chase, the fleeing Camaro repeatedly ran stop signs and slowed only slightly at intersections. The Camaro and the police cars pursuing it also ran a number of red lights.

Officer Tesoroni radioed police headquarters that he was in pursuit. Other police officers in the vicinity attempted to bring the fleeing Camaro to a forced halt by parking their cruisers in its path. Their efforts were not successful. Other police vehicles joined in the chase.

The pursuit ultimately came to a tragic end when the fleeing Camaro struck a pickup truck broadside in an intersection which the Camaro crossed against the light, killing the two occupants of the truck, and severely injuring two occupants, and killing one occupant of the Camaro.

Following reargument on appeal, the Third Circuit affirmed the district court's grant of summary judgment in favor of the pursuing officers, finding that their conduct during the chase did not "shock the conscience" and was not, therefore, a constitutional violation under the Due Process Clause of the Fourteenth Amendment.

Comparison of Cpl. Dorman's conduct with that of the pursuit officer in a Fourth Circuit case, *Temkin, supra,* leads to the same conclusion. In *Temkin, supra,* the Fourth Circuit held that the pursuing officer's conduct did not shock the conscience. What prompted, and occurred during the pursuit was the following: The police officer, Deputy Sheriff Glen Shelby, saw a car spinning its wheels as it pulled out of a filling station. The officer activated the cruiser's lights and sirens, signalling the operator to pull over. The operator ignored the signal, and the pursuit began. The officer learned from his dispatcher during the pursuit that the operator he was pursuing had left the station without paying for $17.00 worth of gasoline. Pursuit continued with both vehicles reaching speeds between 65 and 105 miles per hour. The vehicles traveled along "a narrow, two-lane highway traversing an area of varying population." The chase ended when a vehicle, operated by Sharon Temkin, travelling in the

---

9. The facts surrounding the pursuit are, for the most part, not in dispute. In instances, where there is a disagreement, we have taken the view most favorable to the plaintiff's case.

opposite direction, was struck by the fleeing motorist when he failed to negotiate a curve and crossed over a double yellow line. The pursuing officer was unable to bring his vehicle to a halt in time, and the cruiser struck the Temkin vehicle broadside. Temkin sustained "severe and permanent injuries" in the crash. She and her husband initiated an action against the pursuing officer and the county commissioners. *Temkin,* 945 F.2d at 718.

The district court granted summary judgment in favor of the defendants. On appeal, the Fourth Circuit affirmed, and considered the following factors in determining whether the defendant officer's conduct rose to the level of a constitutional violation:

> 1) the chase continued for a significant period of time over a ten mile area; 2) the chase continued at a very high rate of speed; 3) the chase was initiated because of a minor violation; 4) the police already had, at a minimum, a partial identification of the license plate of the suspect vehicle; and 5) the chase violated [the force pursuit policy] because [the officer] failed to maintain radio contact with his supervisor throughout.

It also took into consideration expert deposition testimony submitted by the plaintiffs characterizing the officer's conduct as "reckless, totally irresponsible, and wanton." Based on all of these factors, the Fourth Circuit concluded that although Selby's conduct was "disturbing and lacking in judgment" it did not "shock the conscience," and did not, therefore give rise to a constitutional violation. *Id.* at 723. See also: *Jones v. Sherrill,* 827 F.2d 1102, 1106–07 (6th Cir. 1987) (Applying a gross negligence standard, the Sixth Circuit held that police officers' pursuit of a traffic violator at speeds up to 135 miles per hour in city traffic was "not sufficient to charge the government officials with outrageous conduct or arbitrary use of government power" since the officers initiated the chase "to protect public safety.") and *Fulkerson v. City of Lancaster,* 801 F.Supp. 1476, 1481 (E.D.Pa.1992), *aff'd without published opin.,* 993 F.2d 876 (3d Cir. 1993). Cf. *Reed v. Allegan County,* 688

F.Supp. 1239, 1240, 1243–44 (W.D.Mich.1988) (Allegations that defendant police officers placed an unlit roadblock directly in path of fleeing vehicle held sufficient to state a claim for recklessness or gross negligence).

In light of the foregoing, we find the evidence presented by plaintiff insufficient as a matter of law to demonstrate that Cpl. Dorman's conduct shocks the conscience. We will, therefore, grant summary judgment in favor of defendants on plaintiff's Fourteenth Amendment claim.

### Monell claim

Plaintiff's only remaining federal claim is his *Monell* claim against the Borough of State College. Carroll bases that claim on allegations that the Borough failed to train its police officers in proper pursuit techniques or to adopt more restrictive pursuit policies, and that such failures caused his injury.

Carroll argues that the Borough's failure to communicate to its police officers specific guidelines for deciding when to pursue a suspect, when not to pursue and when to abandon the chase, and to communicate such guidelines to its officers either by way of policy statements or training, was a violation of his constitutional rights and the cause of his injuries.

He proposes to demonstrate municipal liability with evidence that: 1) Borough officials had knowledge of the propensity for such incidents, because two years prior to plaintiff's accident, in October, 1988, another motorcyclist being pursued by State College Borough police was fatally injured when his motorcycle struck a police roadblock; 2) subsequent to plaintiff's accident, another motorcyclist was injured while being pursued by State College Borough police; 3) in the opinion of a law enforcement expert, Dr. Geoffrey P. Alpert, State College pursuit policies and training were inadequate;[10] and 4) the demographics of State College increase the likelihood that persons will be injured during police pursuits, since there is a high percentage of college students.

---

**10.** Record Document No. 13, exhibit "C."

■ To recover under *Monell*, a plaintiff must: 1) identify the officials or governmental bodies with final policymaking authority; and 2) prove that those individuals "have, through their decisions, 'caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.'" *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1062 (3d Cir.1991), quoting *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). See also: *Fagan II—panel, supra,* 22 F.3d at 1291.

■ *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989) expanded the bases for *Monell* liability to include inadequate police training. To recover under a failure to train theory, the plaintiff must demonstrate that: 1) the failure to train amounted to a deliberate indifference to the rights of persons with whom the police come in contact; and 2) the municipality's policy actually caused a constitutional injury. *Id.* at 389–90, 392, 109 S.Ct. at 1205–06, 1206. To meet the deliberate indifference standard, the failure to train must reflect a deliberate or conscious choice made by municipal policymakers. *Id.* at 389, 109 S.Ct. at 1205. See also: *House v. New Castle County,* 824 F.Supp. 477, 485 (D.Del. 1993).

*Fagan II, supra,* again provides guidance, although this time we look to the panel opinion following reargument instead of the *en banc* opinion, which did not address the issue of municipal liability.

■ The absence of individual liability on the part of Cpl. Dorman is not a bar to plaintiff's proceeding with his claim against the Borough. The panel decision in *Fagan, supra,* held that a municipality may be held independently liable for violating the plain-

tiff's constitutional rights, even if there is no individual liability on the part of any officer. *Fagan II—panel, supra.*

A finding of municipal liability does not depend automatically or necessarily on the liability of any police officer. Even if an officer's actions caused death or injury, he can only be liable under section 1983 and the Fourteenth Amendment if his conduct "shocks the conscience." *Id.* The fact that the officer's conduct may not meet that standard does not negate the injury suffered by the plaintiff as a result. If it can be shown that the plaintiff suffered that injury, which amounts to deprivation of life or liberty, because the officer was following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights. The pursuing police officer is merely the causal conduit for the constitutional violation committed by the City.

*Fagan II, supra,* 22 F.3d at 1292.[11]

The standard for imposing liability on a municipality is not the same as that for imposing liability on an individual officer. While the individual can be held liable only if his conduct "shocks the conscience," a municipality can be held liable for the violation of constitutional rights in a police pursuit if the policymakers acted with "deliberate indifference" "to the rights of persons with whom the police came into contact." *Simmons, supra,* 947 F.2d at 1059–60 and 1064. See also: *Fagan II—panel, supra.*

■ Liability on the part of the municipality is premised on evidence of culpable conduct on the part of a policymaking official. *Simmons, supra,* at 1063. In this context, that requires a showing that Borough policymakers acted with deliberate indifference to

---

11. The Third Circuit distinguished the Supreme Court decision cited by defendants as controlling, *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) ("[N]either *Monell* ... nor any other [Supreme Court decision] authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.") *Fagan II, supra,* 22 F.3d at 1291.

the rights of fleeing suspects by: demonstrating that they were aware of prior incidents evidencing the hazard police pursuits posed to such persons, but either deliberately chose not to train Borough police officers in pursuit techniques or acquiesced in a longstanding practice or custom of providing no training in that regard or failed to adopt adequate pursuit policies to discourage unconstitutional police conduct. *Simmons, supra*, 947 F.2d at 1064.

Paraphrasing the Third Circuit's language in *Simmons, supra*, it is necessary for us to determine:

> whether there is the minimum quantum of evidence in the record to support a jury conclusion that, in light of the duties assigned to officers responsible for ... [pursuing suspects] ... 'the need for more or different training [or different or more specific policy statements was] so obvious, and the inadequacy [of lack of such policies] so likely to result in the violation of constitutional rights, that the policymakers of the ... [borough] [could] reasonably be said to have been deliberately indifferent to the need.'

*Simmons, supra*, 947 F.2d at 1069. See also: *Jones v. Chieffo*, 833 F.Supp. 498, 510 (E.D.Pa.1993) ("[T]o make out a claim of deliberate indifference, plaintiffs must show that a municipality's policymakers were put on notice, whether actually or constructively, of the need for a different policy, before they can be found to be deliberately indifferent to that need.") and *Fulkerson, supra*, 801 F.Supp. at 1483.

Carroll argues that the State College "policy is grossly devoid of any standards by which an officer could determine proper behavior even if he were the most conscientious of police officers." Plaintiff's opposing brief at p. 24. Nothing could be further from the truth. State College Borough has extensive, detailed guidelines on the subject of police pursuit, which were in effect at the time of plaintiff's injury.

Contrary to plaintiff's contention that the policy is vague and offers police officers little guidance, the policy expressly directs the pursuing officer to weigh the necessity of immediate apprehension against the danger created by the chase and abandon the pursuit if such concerns do not justify its continuance.

The guidelines, which were adopted and became effective on September 1, 1984, provide, *inter alia*, that the

> primary goal of the Bureau [in a motor vehicle pursuit situation] is the protection of life and property. To the extent that a motor vehicle pursuit exposes any officer, suspect, or member of the general public to an unnecessary risk of harm or injury, then the pursuit inconsistent with that goal.
>
> IT IS THE POLICY OF THIS BUREAU THAT A MOTOR VEHICLE PURSUIT IS JUSTIFIED ONLY WHEN NECESSITY OF IMMEDIATE APPREHENSION OUTWEIGHS THE LEVEL OF DANGER CREATED BY THE PURSUIT.

(Record document no. 13, exhibit "D", ¶ 5.05.-01. Emphasis original.)

Two categories of situations are defined in which an officer is permitted to exceed the posted speed limit. One is in the event of an "emergency situation," which is defined to include a call for assistance from a fellow officer, a call that a holdup is in progress, a call for assistance to a seriously injured individual, etc. In such cases, the policy provides that the officer may exceed the posted speed limit by 15 miles per hour. The other situation is during a "high-speed" pursuit, defined as a situation in which the officer conducting a chase reaches seventy miles-per-hour. In both cases, the officer is required to activate all emergency lights and sound equipment on the cruiser from the start of the pursuit until its termination.

Specific guidelines are provided for determining whether a pursuit should be initiated or continued consistent with the objectives set forth in ¶ 5.05.01 of the policy.

When a pursuit is initiated, policy guidelines require that it be immediately reported to the dispatcher. ¶ 5.05.03. Once such notification is received, the supervisor on duty is required to monitor the pursuit and is authorized to order its "immediate termination" at any time "when in his/her judgment the ne-

cessity of immediate apprehension is outweighed by the level of danger created by the pursuit." ¶ 5.05.05.

The "factors to be considered when determining to initiate, continue or terminate a pursuit" include:

A. Time of day—High speed pursuits occurring during a time when there is a high level of business, school or other activity are deemed as more hazardous than those occurring during periods of low activity.

B. Volume of vehicular traffic—Pursuits occurring during periods of heavy traffic flow are deemed more hazardous than those occurring at other times.

C. Location of pursuit—Pursuits through residential areas or along streets near to or adjacent to schools are viewed as more hazardous than those in lightly populated areas.

D. Weather conditions

E. Road conditions

F. Speeds involved

G. Nature of charges—Pursuits for person(s) suspected of involvement in serious crimes are viewed as more justifiable than those for persons suspected of only traffic or other misdemeanor violations.

H. Volume of pedestrian traffic

¶ 5.05.05.

The specific guidelines adopted by the Borough refute any suggestion that Borough policymakers acted with deliberate indifference in failing to adopt guidelines designed to discourage unconstitutional police conduct. See: *House, supra,* 824 F.Supp. at 486 (Municipal policy concerning the use of force by police "undoubtedly constitutional on its face"). They spell out in considerable detail what factors an officer is to consider in deciding whether it is advisable to initiate, continue or abandon pursuit of a suspected lawbreaker. They also require radio contact with the supervisor on duty and activation of the cruiser's lights and siren so that both the fleeing vehicle and third parties are aware of the pursuing cruiser; and perhaps most important of all, they stress in no uncertain terms that if there is any doubt about the advisability of conducting a chase, safety concerns are to outweigh all others. See generally: *Manarite v. City of Springfield,* 957 F.2d 953, 959–60 (1st Cir.1992); *Galas, supra,* 801 F.2d at 205 (City police pursuit policy providing that officers may follow suspects "who refuse to obey an officer's directive to pull to the side of the road" held not to infringe Fourteenth Amendment rights); *Fulkerson, supra,* 801 F.Supp. at 1481–85 (Court found no evidence of deliberate indifference on the part of city officials.); *Timko v. City of Hazleton,* 665 F.Supp. 1130, 1135–36 (M.D.Pa.1986) ("City's failure to have a specific policy concerning police pursuits" not a basis for liability under the facts presented.)

■ Plaintiff submitted evidence of a prior incident in which a motorcyclist died of injuries sustained when he crashed while being pursued by State College Borough Police as proof that Borough officials had actual notice that existing guidelines were inadequate. The prior incident occurred on October 28, 1988 when a university student named Gerald Biacchi fled on his motorcycle after police attempted to apprehend him because he was observed acting suspiciously. Biacchi died from injuries sustained in the crash. Although he was being pursued by State College Police, Biacchi was injured when his motorcycle struck a roadblock erected by Pennsylvania State Police, from the Rockview barracks, unbeknownst to the pursuing State College officer. Carroll argues that this incident proves that Borough officials knew of the propensity for accidents of this type, but failed to adopt more stringent guidelines limiting or forbidding such pursuits.

To establish liability on the part of a municipality for a police pursuit based on an alleged failure to train, the plaintiff "must at least demonstrate a pattern of similar incidents in which citizens were injured." *Dismukes v. Hackathorn,* 802 F.Supp. 1442, 1451 (N.D.Miss.1992), citing *Leatherman v. Tarrant County Narcotics Intelligence,* 954 F.2d 1054 (5th Cir.1992).

■ A single prior incident is insufficient as a matter of law to establish liability on the

part of a municipality to take preventive action. "In the absence of any unconstitutional statute or rule, it is the Plaintiffs' burden to articulate a factual basis that demonstrates considerably more proof than a single incident." *House, supra,* 824 F.Supp. at 486, citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985).

■ As for the contention that Borough police officers did not receive adequate instruction and training in pursuit techniques, Cpl. Dorman's testimony is, again, controlling. Aside from the expert report of Dr. Alpert,[12] Cpl. Dorman's testimony is the only evidence cited as support for plaintiff's contention that the training was inadequate. Cpl. Dorman testified that he did receive instruction and training both in pursuit driving techniques, which included practice driving sessions, and in the factors to be considered in deciding whether to pursue a fleeing suspect. (Record document no. 13, exhibit "E," Dorman deposition at pp. 18–23)

Dr. Alpert discussed what are in his opinion two specific flaws in the Borough's training policy and its responsive action to alleged safety violations:[13] 1) failure to provide enough training; and 2) failure to discipline officers involved in alleged safety violations.

Although Dr. Alpert criticizes the amount of training which Cpl. Dorman received as inadequate, his opinion on the necessity of training in general supports defendants' position. Dr. Alpert states that: "There is a strong relationship between a policy and the training necessary to support it. The more vague a policy, the more decisions an officer must make about risk and the likelihood of immediate apprehension." Here, the State College policy provided very specific guidance for determining whether a pursuit should continue or be abandoned, and stressed that safety is the uppermost concern.

Dr. Alpert's criticism that the Borough had, in the past, failed to discipline officers involved in chase incidents is not supported by the facts. The only *prior* incident cited by plaintiff is the October, 1988 incident described above in which Alan Biacchi was killed when the motorcycle he was operating struck a police roadblock while he was being pursued by a Borough officer. The problem with Dr. Alpert's criticism that such conduct was permitted to go unpunished is that the conduct which led to the injury was that of a Pennsylvania State Police officer, not a State College Borough officer. The account of the incident in the newspaper article submitted by plaintiff in opposition to defendants' motion plainly states that it was a State Police officer who erected the roadblock. That officer was not under the supervision or control of State College Borough, hence it had no responsibility, and no right, to discipline him.

Dr. Alpert's other criticism goes to the failure of the police department to have another police officer exercising supervisory control over Cpl. Dorman and making the determination as to when and if the chase should be abandoned.[14] This alleged defect goes to a respondeat superior type of liability, not to actionable conduct on the part of the Borough, the only type of recovery available under *Monell, supra,* and its progeny.

Moreover, even if we give full credence to all conclusions and opinions stated by Dr. Alpert, as we are bound to do, *Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224 (3d Cir.1993), his conclusions do not support a finding that the Borough's conduct rose to the level of culpability required to establish liability under *Monell* and *Canton, supra.* In *Simmons, supra,* an action in which the City of Philadelphia was accused of failing to take appropriate steps to decrease the possibility of suicide by pretrial detainees, the Third Circuit held that to establish liability on the part of the city, the plaintiff had to show that "the officials determined by the district court to be the responsible policy-

---

12. Record document no. 13, exhibit "D."

13. Much of Dr. Alpert's criticism and opinions are directed at the conduct of Cpl. Dorman and the choices which he made during the pursuit. All comments going to those issues are irrelevant, in light of this court's holding that plaintiff cannot recover against Cpl. Dorman as a matter of law.

14. Record document no. 13, exhibit "C", p. 14.

makers were aware of the number of suicides in City lockups and of the alternatives for preventing them, but either deliberately chose not to pursue these alternatives or acquiesced in longstanding policy or custom of inaction in this regard." *Id.* at 1064. The court also stated that to prove liability on a failure to train theory the plaintiff must show that municipal policymakers who had knowledge of the problem "either deliberately chose not to provide officers with training in suicide prevention or acquiesced in a longstanding practice or custom of providing no training in this area."

In *Canton, supra,* the United States Supreme Court stressed that in determining the adequacy of training provided by a municipality, the focus is not on the training or lack of training a particular officer has received, but instead on

> the adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

*Id.,* 489 U.S. at 390–91, 109 S.Ct. at 1206, citing *Springfield v. Kibbe,* 480 U.S. 257, 268, 107 S.Ct. 1114, 1120, 94 L.Ed.2d 293 (1987) (O'Connor, dissenting) and *Oklahoma City v. Tuttle, supra,* 471 U.S. at 821, 105 S.Ct. at 2435. The Court also stated that:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in an injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* 489 U.S. at 391, 109 S.Ct. at 1206.

No proof of such deliberate indifference has been presented here. The most that is demonstrated by Dr. Alpert's report and the other evidence which plaintiff relies upon is that Borough officials should have become concerned that their present policies were not stringent enough and should either have been made more restrictive or been supplemented with further training. That is not sufficient to show deliberate indifference to a known problem.

■ Dr. Alpert's conclusions establish, at the very most, that the Borough may have been negligent in failing to provide more training or to adopt still more stringent guidelines for its officers. Negligence is not an adequate basis for the imposition of municipality liability under section 1983 in this context. It is not a substitute for the requisite showing of deliberate indifference. See, e.g. *Bowen v. City of Manchester,* 966 F.2d 13, 18 (1st Cir.1992).

■ Carroll must also prove a causal connection between the Borough's conduct and the violation of his constitutional rights. *Bowen, supra,* 966 F.2d at 18. Here, that connection is lacking. The result which plaintiff argues should have come about had the Borough had adequate policies is a decision by Cpl. Dorman or his supervisor to abandon the chase once he either identified the license number or the operator, or the chase became hazardous. Cpl. Dorman testified that he had decided to abandon the chase just before the crash occurred, because he had obtained the license number and saw nothing to be gained from continuing the pursuit. While plaintiff would undoubtedly argue that the decision to abandon the chase should have been made at some earlier point, Cpl. Dorman's uncontroverted testimony fails to provide any causal link between the Borough's conduct and the plaintiff's injury.

Summary judgment will be entered in the Borough's favor on the *Monell* claim.

### Fifth Amendment claim

■ Although plaintiff alleges a claim for the violation of his Fifth Amendment rights, he does not address the issue in his opposing brief. We, therefore, deem it waived. See: Local Rule 401.6. We cannot, in any event,

fathom any basis for such a claim under the facts of this case.

 The Fifth Amendment provides that:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ... nor shall any person be subject of the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; no shall private property be taken for public use, without just compensation.

U.S. Const. amend. V. The last clause is the only section with any possible application to the facts of this case, and it applies to the conduct of the federal government, not state authorities. Conduct of state authorities which allegedly operates to deprive citizens of their life, liberty or property without due process is governed by the Fourteenth Amendment. Application of the Fourteenth Amendment to the claims asserted in this case is discussed *supra.*

### Remaining state law claims

The only claims remaining are plaintiff's pendent state law claims for willful misconduct (Count IV), negligence *per se* (Count V) and reckless disregard (Count VI).

No independent basis for the exercise of federal jurisdiction over those claims is alleged. There is no basis for diversity jurisdiction, since all parties are alleged to be Pennsylvania residents. (See: plaintiff's complaint).

 Since no federal claims remain and this case is not yet ready for trial, considerations of comity dictate that we relinquish jurisdiction over the pendent state claims remaining. Under section 1367(c)(3) of the Judicial Improvements Act of 1990, 28 U.S.C.A. § 1367(c)(3) (West Supp.1992), we may, in our discretion, decline to exercise supplemental jurisdiction if all claims over which we had original jurisdiction have been dismissed, as is the case here.

In deciding whether to dismiss such pendent claims, the district court should take into account generally accepted principles of "judicial economy, convenience, and fairness to the litigants." *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1284 (3d Cir.1993), citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Whether a dismissal of the touchstone claim should bring about a dismissal ... of the dependent claim for want of supplemental jurisdiction should hinge on the moment within the litigation when the dismissal of the touchstone claim takes place and on the other surrounding circumstances.... [I]f the dismissal of the main claim occurs late in the action, ... knocking [the dependent claims] down with a belated rejection of supplemental jurisdiction may not be fair.

*Id.,* quoting David D. Siegel, Practice Commentary, appended to 28 U.S.C.A. § 1367.

In this case, trial is still several months away. Since no federal claims remain and the case is not yet ready for trial, dismissal is appropriate. Plaintiffs' remaining claims can more appropriately be tried in state court.[15] Cf. *Growth Horizons, supra,* 983 F.2d at 1285 (District court had already held a trial on the merits and had already heard all the evidence necessary to reach a decision on the plaintiff's contract claim.) We will, therefore, dismiss the remaining state claims without prejudice.

\* \* \* \* \* \*

An order will be entered consistent with this opinion.

---

**15.** See: 42 Pa.C.S.A. § 5103(b) (Supp.1994) and 28 U.S.C. § 1367(d) regarding transfer of the case to state court and the tolling of the statute of limitations.